Thomas STRASSER and Sandra R. Strasser, Plaintiffs-Appellants-Petitioners,
LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,

v.

TRANSTECH MOBILE FLEET SERVICE, INC. and Heritage Mutual Insurance Company, Defendants-Respondents.

Supreme Court

*No. 98–1581. Oral argument May 2, 2000.—Decided July 7, 2000.*

2000 WI 87

(Also reported in 613 N.W.2d 142.)

438

For the plaintiffs-appellants-petitioners there were briefs by *Louis E. Baureis, Robert B. Erdmann* and *Daniel P. Kondos, S.C. Law Offices*, Milwaukee, and oral argument by *Robert B. Erdmann*.

For the defendants-respondents there was a brief by *Arthur P. Simpson* and *Simpson & Deardorff, S.C.*, Milwaukee, and oral argument by *Arthur P. Simpson*.

An amicus curiae brief was filed by *David J. Hanus* and *Hannan, Siesennop & Sullivan*, Milwaukee, on behalf of the Civil Trial Counsel of Wisconsin.

An amicus curiae brief was filed by *D.J. Weis, Diane Hubler*, and *Habush, Habush, Davis & Rottier, S.C.*, Rhinelander, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. Thomas and Sandra R. Strasser (Strasser) seek review of an unpublished decision of the court of appeals[1] that affirmed a decision of the Circuit Court for Milwaukee County, Patricia D. McMahon, Judge. The circuit court granted summary judgment to Transtech Mobile Fleet Service, Inc. and its insurer, Heritage Mutual Insurance (collectively Transtech), in a personal injury action brought by Strasser after he slipped and fell from a crane ladder that Transtech fabricated and installed.

¶ 2. Strasser alleged Transtech negligently failed to install safety step treads on the ladder rungs and negligently failed to warn him about the danger the ladder posed. In granting summary judgment to

---

[1] *Strasser v. Transtech Mobile Fleet Serv. Inc.*, No. 98–1581, unpublished slip op. (Wis. Ct. App. Aug. 31, 1999).

439

Transtech, the circuit court relied on this court's decision in *Rolph v. EBI Cos.*, 159 Wis. 2d 518, 464 N.W.2d 667 (1991) and held that as a "reconditioner," Transtech was under no duty to bring the ladder into compliance with specific safety standards. The court also concluded that Transtech was under no duty to warn Strasser about an open and obvious danger.

¶ 3. The court of appeals affirmed, adopting a different theory. *Strasser v. Transtech Mobile Fleet Serv. Inc.*, No. 98–1581, unpublished slip op. at 6, 2 (Wis. Ct. App. Aug. 31, 1999). The court held that Transtech was entitled to summary judgment because Strasser confronted an open and obvious danger. *Id.* at 8–9. Judge Curley concurred in the result but disagreed with the majority's reliance on the open and obvious danger doctrine. She instead found the holding of *Rolph* dispositive and declared that Transtech could not be held strictly liable for the repair of a product that it did not place into the stream of commerce. *Strasser*, unpublished slip op. at 1–2 (Curley, J., concurring). Judge Curley also concluded that Transtech could not be negligent for failure to warn because *Rolph* absolves reconditioners from the duty to warn about defects in original products. *Id.* at 2.

¶ 4. Strasser presents two issues for our review. First, does the open and obvious danger doctrine bar recovery in this case? Second, does our holding in *Rolph*, relating to the limited liability of reconditioners, preclude relief for this claim?

¶ 5. We frame our decision around the two claims Strasser presented in his pleadings, namely whether Transtech was negligent in its fabrication of the ladders, and whether Transtech was negligent in failing to warn Strasser about the condition of the ladders. We hold that summary judgment was inappropriate

because our holding in *Rolph* does not apply to the particular facts of this case, and this case presents questions of material fact that require resolution by a factfinder. We also conclude that the claim for failure to warn cannot go forward because Transtech was not negligent in failing to warn Strasser about a condition known to be dangerous. Accordingly, we reverse the decision of the court of appeals and remand the case to the circuit court for trial or further proceedings consistent with this decision.

## ⚬ FACTS

¶ 6. Some of the facts in this case are in dispute. Strasser began working at Recycled Fibers in January 1993. Recycled Fibers is a Milwaukee company that collects bales of cardboard boxes from various locations, such as grocery stores, and recycles them at its plant. Strasser was a truck driver and crane operator for the company.

¶ 7. Strasser loaded large quantities of heavy baled cardboard using a crane mounted on the flatbed trailer of a truck. The trailer-mounted crane assembly was manufactured by a company that is not a party in this action, Transcraft. The crane featured two ladders, one mounted on each side. To operate the crane, Strasser, who weighed 180 pounds, would climb up one of the ladders. Upon reaching the top, he positioned himself on a seat situated about 13 feet in the air. From this seat, Strasser controlled the crane and collected the bales of cardboard boxes. During the course of this work, he climbed up and down the crane ladders about 30 times each day.

¶ 8. The crane Strasser used was maintained and repaired by Transtech, a mobile fleet repair service. In 1994, Transtech employed four to five people

441

and had accounts with approximately 25 businesses, including Recycled Fibers. Transtech did not sell trailers, cranes, or parts to Recycled Fibers or any other business. Between 1993 and 1994, Transtech's owner and operator, Darryl Frick (Frick), personally supervised the Recycled Fibers account, providing services "constantly" by making several daily visits to the plant.

¶ 9. Frick was responsible for all the maintenance work, including the checking of hydraulic lines, hoses, brakes, and lights, and anything else requested to be repaired. At his deposition, Frick testified that he often made repairs at the request of the drivers and not always with the authorization of Recycled Fibers' regional or district manager, Tom Marzo (Marzo).

¶ 10. Frick and his employees frequently straightened and rebolted the crane ladders on several of the trailers Recycled Fibers owned. The rickety ladders often bent and twisted because the bolts that attached the ladders at the top and bottom to the crane assembly came out as the bales bumped and hit them. Although Frick wanted to make his repairs safe, he stated that Recycled Fibers "didn't give me a standard or I didn't give them a safety standard to keep up with."

¶ 11. After the two crane ladders on the trailer Strasser operated were destroyed, either by being hit by a bale or piece of machinery, Strasser's boss, Marzo, asked Frick to put better ladders on the crane. Frick never acted as a seller, distributor, or dealer for any type of ladder.

¶ 12. Both Strasser and Marzo told Frick they wanted a sturdier ladder and asked Frick to install "safety steps" or an "expanded metal step." Strasser described these steps as "stair treads" featuring U-shaped pieces of metal with holes punched through that "left prickers sticking out the top" to prevent slip-

ping. Frick acknowledged that safety steps were important because hydraulic fluid sometimes leaked onto the steps. The existing rungs on the ladders had grooves cut into them, creating what Strasser called a "non-slip bar," not safety steps.[2]

¶ 13. Frick interpreted the discussion about safety steps as "more of a request. . . . They said, 'if you can get this on there, that's what we'd like.' " Marzo told Frick, "It would be really nice to have steps like they put on the newer crane." Frick informed Strasser and Marzo he would not be able to meet the request: He did not have the materials and would not be able to obtain them in the time frame allotted for the job because his supplier did not stock them.[3] Frick said Marzo told him that Recycled Fibers had materials for the safety steps in its mill. When Frick went to the mill as Marzo suggested, he found no one there willing to give him the material.

¶ 14. Strasser testified that Frick never verbally made any representations that he could bring the trailer into compliance with any safety standards. Moreover, Strasser never asked Frick to have the ladders comply with any government safety standards or be "up to code" with any specific safety rules. Similarly, Frick stated that Recycled Fibers made no demands to bring the ladders in line with any safety standards.

¶ 15. A March 29, 1994, invoice indicates that Transtech fabricated and installed ladders for the crane on Strasser's trailer. To Frick, "fabricate and

___

[2] Frick stated that the old rungs had no grooves and were completely smooth.

[3] Strasser testified that Frick worked on the trailer for a "[c]ouple of hours" and stated that he waited for it while Frick did the work. Frick expected the crane to be dropped off at Transtech on Friday and returned Sunday night.

install" meant that he was building new ladders to replace the old ones on the trailer, thus repairing the machine as a whole, not providing the machine with new parts. Strasser testified that Frick "built new uprights and put rungs in between."

¶ 16. The rungs on the new ladders were made from cut "U bolts" consisting of threaded metal. The threaded metal created grooves running about three-quarters of the way across the ten-inch long rungs. Thus, about two-and-one-half inches of each rung was smooth.

¶ 17. Strasser picked up the crane from Frick. Frick testified that Strasser told him "how great [the ladders] looked" and made no mention of the request for safety steps. Moreover, Frick did not remember any complaints directed to him about the ladders or requests for further modifications after he completed the work.

¶ 18. Strasser disputes Frick's account, stating that he telephoned Frick and told him to install non-slip stair treads on the rungs on "[t]he day he built the ladder." Strasser testified that Frick did not have the treads and did not know where to obtain them. Although Strasser knew the treads could be found at the Recycled Fibers power house, he conceded that he did not tell Frick to procure them there.

¶ 19. According to Strasser, the fabricated ladders had completely smooth treads. He stated that the new rungs provided a wider footing. But after he began using the ladders, Strasser found the steps slippery and attributed that condition to the lack of non-slip stair treads on the rungs. Within a few days after Frick did the work, Strasser slipped twice. Strasser did not return the ladder to Frick. But Strasser told Marzo about the slipperiness, and Strasser instructed a dis-

patcher to call Frick "and tell him to make it right." Frick did not recall being contacted by the dispatcher, but he stated that it was possible that Strasser may have mentioned that he nearly fell off the ladder.

¶ 20. On June 7, 1994, Strasser was picking up baled cardboard in cloudy, drizzling midday weather in an alley behind a Piggly Wiggly store. Strasser had only one stop left after this supermarket, and he already had been to 25 or 30 sites. He experienced no difficulties going up the ladder. On his way down, however, both of Strasser's feet slipped on the bottom rung. When his feet slipped, Strasser lost his grip on the ladder with both hands and, instead of landing on the bed of the trailer, fell about four and one-half feet to the concrete pavement below.

¶ 21. Strasser injured his right knee in the accident. Although the injury initially was diagnosed as a sprain, Strasser later learned that he suffered torn ligaments and tendons. After surgery, Strasser found that it hurt to walk, and he testified that he has no feeling in the front of his leg. At the time of his 1997 deposition, Strasser still was working at Recycled Fibers as a truck driver and crane operator.

## PROCEDURAL HISTORY

¶ 22. On June 5, 1997, Strasser filed suit against Frick and Transtech, presenting three causes of action. First, the complaint alleged that Transtech negligently designed, manufactured, constructed, assembled, and installed the ladders. Second, the complaint stated that Transtech negligently failed to provide Strasser with reasonable warnings about the defects it knew, or should have known, were present in the ladders. Third, Strasser submitted a derivative claim, contending that

Sandra Strasser suffered loss of consortium because of her husband's injuries.

¶ 23. The parties entered a stipulation on January 16, 1998, dismissing Frick as a defendant.[4] Transtech moved for summary judgment on January 30 on the grounds that: (1) as a reconditioner it owed no duty to bring the trailer-mounted crane assembly into compliance with applicable safety standards, and (2) it owed Strasser no duty to warn about the open and obvious condition of the ladders on the crane assembly.

¶ 24. The circuit court granted Transtech's summary judgment motion, holding that the controversy presented no genuine issue of material fact.[5] The court based its rationale on three factors. First, Transtech

---

[4] On January 26, 1998, Marzo met with a notary public and recorded an affidavit in which he explained that Strasser fell from a ladder recently repaired by Frick at his orders. Marzo indicated that Frick was "to install ladder tread on the crane" and stated that he complained to Frick after Frick failed to make the modification. Marzo believed that Strasser also complained about the tread.

[5] At the motion hearing, the court refused to admit Marzo's handwritten affidavit as evidence. The court reasoned that the affidavit presented no "indicia of formality:" It had no date, did not indicate where the statement was made, and did not state whether it was taken under oath. The court also suggested that the affidavit was taken after the discovery period had closed. The circuit court noted that the affidavit speaks to the fact in dispute in this case, namely whether Strasser actually asked Frick to install the safety treads: "[I]f you believe Marzo, if you accept the affidavit, Transtech was asked to put certain items on, they didn't do it, and so they didn't fulfill their request." The circuit court found, however, that even if Marzo's statement were accepted, it provided no basis for deciding against the summary judgment motion because other legal arguments weighed in Transtech's favor.

could not be held liable under *Rolph*. The court stated that as a reconditioner, "Transtech did not sell the ladders. They didn't know of any specific industry or government safety standards. They did not represent that they could bring the trailer in compliance with any standards, and there is no evidence of a request for those standards."

¶ 25. Second, the circuit court reasoned that *Rolph* requires expert testimony about current safety standards. Although the court found that "there was a request that safety steps" be installed, Strasser provided no evidence that the steps would have complied with a specific standard or that the safety steps would have prevented the accident. Third, the court held that Transtech was under no duty to warn Strasser about an open and obvious condition of the ladders.

¶ 26. Strasser appealed. In a majority opinion authored by Judge Schudson, the court of appeals affirmed but declined to follow the circuit court's reasoning. The court rejected the *Rolph* analysis for two reasons. First, it found that Transtech was not a "reconditioner" because Transtech built and installed new ladders. *Strasser*, unpublished slip op. at 7–8. Second, the court found that expert testimony about safety standards was not necessary because an average juror understands that ladder rungs with treads are safer. *Id.* at 7. Instead, the court of appeals affirmed the decision on the basis of the open and obvious danger doctrine.[6]

---

[6] The court reasoned:

Strasser knew exactly what he was receiving and whether it provided the safety he desired. Nothing could have been more open and obvious, thus erasing any possible duty Transtech otherwise might have had to warn of any danger. Strasser accepted the crane with the new ladders. He "can't have it both ways." Thus, according

¶ 27. Judge Curley wrote separately to express disagreement with the majority's analysis. *Strasser*, unpublished slip op. at 1 (Curley, J., concurring). Noting that the open and obvious danger doctrine is "merely an element to be considered by the jury in apportioning negligence," Judge Curley concluded that *Rolph* provides the basis for affirming the circuit court's decision. *Id.* at 3–4, 1. Under *Rolph*, "a reconditioner who does not manufacture, distribute, or sell the products it reconditions is not liable in strict products liability for the defects in the machines it reconditions." 159 Wis. 2d at 524. Because Transtech did not manufacture, distribute, or sell ladders—nor place them into the stream of commerce—Judge Curley found that it was a reconditioner that fell under the protections of *Rolph*. *Id.* at 1–2. Moreover, Judge Curley concluded that under ordinary negligence principles, Transtech cannot be responsible for failure to warn about the dangers of the ladder because *Rolph* absolves reconditioners from the duty to warn about a defect in the original product. *Id.* at 2.

## STANDARD OF REVIEW

¶ 28. This case requires the court to review the circuit court's grant of summary judgment to the defendants. Wisconsin Stat. § 802.08 (1997–98) sets forth the procedure for summary judgment. The purpose of summary judgment is to determine whether a controversy can be resolved without a trial. Summary judgment "shall be rendered" if: (1) there is no genuine

---

to the undisputed facts, Strasser cannot support the allegation in his complaint that Transtech "failed to provide. . .reasonable warning of defects and hazards. . .in the ladder."

Unpublished slip op. at 9.

448

issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). A circuit court's decision not to grant summary judgment is often treated with latitude on review, *Lyons v. Menominee Enterp., Inc.*, 67 Wis. 2d 504, 506–07, 227 N.W.2d 208 (1975); but a circuit court's decision to grant summary judgment is a question of law that the court reviews independently. *Gaertner v. Holcka*, 219 Wis. 2d 436, 445–46, 580 N.W.2d 271 (1998).

¶ 29. Summary judgment is a drastic remedy because it deprives the losing party of a trial or even an evidentiary hearing. Still, the law recognizes the cost and inconvenience of litigation, and it requires a party to plead and support its claims or defenses in a timely manner to avoid wasting resources. When the court is faced with a controversy in which no material facts are in dispute and a party's position cannot prevail as a matter of law, it has no obligation to delay judgment and thereby consume additional court time.

¶ 30. In reviewing a decision on summary judgment, we utilize the same methodology as that applied by the circuit court. *Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 110, 595 N.W.2d 392 (1999). A reviewing court thus will not reverse a summary judgment decision unless the record reveals that one or more genuine issues of material fact are in dispute or the moving party is not entitled to judgment as a matter of law. *See Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

¶ 31. The moving party bears the burden of establishing the absence of a genuine issue of material fact. If the moving party makes a prima facie case for

summary judgment, the reviewing court then examines the pleadings, affidavits, and depositions to determine whether any material facts are in dispute that would entitle the opposing party to a trial. *See In re Cherokee Park Plat*, 113 Wis. 2d 112, 115–16, 334 N.W.2d 580 (Ct. App. 1983) (citing *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980)).

¶ 32. Not every factual dispute merits litigation. The dispute must center on a "genuine issue of material fact." A factual issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Baxter v. DNR*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991). A "material fact" is one that impacts the resolution of the controversy. *Interest of Michael R.B.*, 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993). In analyzing whether there are genuine issues of material fact, we draw all reasonable inferences in favor of the nonmoving party. *Grams*, 97 Wis. 2d at 339.

¶ 33. In this case, there is a factual dispute about whether Strasser directed Frick to install safety steps. Under the summary judgment methodology, we will assume, as did the circuit court, that there was a request for safety steps.

## ANALYSIS

¶ 34. We begin our analysis by focusing the nature of our review. As presented to the circuit court, this case centered on two negligence claims.[7] The complaint did not make a strict liability claim or a contract

---

[7] First, Strasser contended that Transtech was negligent in the design, manufacture, construction, assembly, and installation of the ladder by failing to install safety steps on the ladder rungs. Second, Strasser alleged that Transtech was negligent

claim. In its briefs to this court and at oral argument, however, Strasser contoured the controversy as a cause of action sounding in contract.[8] We decline to review the circuit court's summary judgment determination under principles governing contract law. When reviewing summary judgment, this court analyzes the pleadings, depositions, and affidavits by employing the same methodology as the circuit court. We confine our review to the proofs that were before the circuit court and do not consider issues raised for the first time on appeal.

¶ 35. We therefore turn to Strasser's underlying theory of liability, negligence. In one sense, this is a routine case of ordinary negligence. At trial, Strasser would be required to prove four elements: "1) A duty of care on the part of the defendant; 2) a breach of that duty; 3) a causal connection between the conduct and the injury; and 4) an actual loss or damage as a result of

---

because it failed to warn about the dangerous condition of the ladder.

[8] Strasser states that the complaint alleged "claims of product liability, common negligence and breach of agreement." According to Strasser, "Transtech is not liable simply because it reconditioned or disassembled the ladder: it is liable because it specifically agreed to provide non-slip rungs but failed to do so." Stated otherwise, Strasser argues it "is not seeking to recover from Transtech as a reconditioner for its failure to make the rungs 'more safe', but rather because Transtech breached its contractual duty to install non-slip rungs." Strasser summarizes: "*Rolph* does not bar Strasser's ordinary negligence claim sounding in contract."

In her concurrence, Judge Curley noted that "Strasser never pled a breach of warranty cause of action, nor could he, since he had no privity of contract with Transtech." *Strasser*, unpublished slip op. at 3 (Curley, J., concurring).

the injury." *Peters v. Menard, Inc.*, 224 Wis. 2d 174, 192, 589 N.W.2d 395 (1999) (quoting *Rockweit v. Senecal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995)). A factfinder would decide whether Transtech exercised ordinary care in fabricating the two ladders.

¶ 36. In another sense, however, this is an important case involving critical issues of policy and law. Arguably, Transtech fits into the special category of "reconditioner." In *Rolph*, this court took pains to relieve "reconditioners" from liability in certain circumstances as a matter of public policy. We recognized that in some circumstances "reconditioners" are in a difficult position that affects their duty of care.

¶ 37. Because *Rolph* is vital to the resolution of this case, we restate its facts and holding. Kevin Rolph (Rolph) filed a personal injury action against the manufacturer of a bending roll machine in which Rolph caught and seriously injured his hand. *Rolph*, 159 Wis. 2d at 523. The manufacturer, in turn, sued J. C. Busch (Busch), a company that had been hired by the owner of the machine to recondition the machine by disassembling it, cleaning it, inspecting it for wear, and replacing certain parts. *Id.* at 523, 530. The owner had not asked Busch to evaluate the safety of the machine, or to correct any safety problems with the machine, or to warn it if the machine were in an unsafe condition or if new safety devices were available. *Id.* at 537. Busch was not in the business of manufacturing, distributing, or selling machines like the one it reconditioned. It did not place the machine in the stream of commerce. *Id.* at 530. It did not represent that the machine was safe. Busch worked on many different kinds of machines in its business, so it did not keep abreast of all new safety devices or safety standards. *Id.* at 531. Two expert witnesses, however, gave deposition testimony about

current safety standards for bending roll machines and concluded that installation of an emergency stop device would have prevented Rolph's injury. *Id.* at 526–27.

¶ 38. In *Rolph*, the manufacturer of the machine, in an effort to obtain third party contribution for damages, argued that Busch had a duty to correct a dangerous condition in the machine or at least to warn users of the machine that it was dangerous or failed to meet current safety standards.

¶ 39. This court sustained a summary judgment in favor of Busch on strict liability. *Id.* at 532. It ruled that a reconditioner who does not manufacture, distribute, or sell the products it reconditions is not liable in strict liability for the machines it reconditions. *Id.* at 524.

¶ 40. The court also supported Busch on a distinct, second issue, a claim of ordinary negligence. *Id.* at 532. The court ruled that a reconditioner does not have a duty to bring the machines it reconditions into compliance with applicable safety standards, *except*: (1) when it holds itself out as bringing machines into compliance with safety standards, and (2) when it is requested to do so by the machine's owner. *Id.* at 524. The court explained that imposing liability on the reconditioner for "failing to correct a design defect simply because it reconditioned the machine would make all repairers who disassemble a product in order to repair it insurers against design defects created by manufacturers." *Id.* at 535.

¶ 41. This examination shows that under *Rolph*, a "reconditioner" who does not change a machine, who simply restores a machine to an earlier condition by repairing it, renovating it, or rebuilding it may not be

held liable for defects in the original machine or for failing to alert its customer about dangers, particularly hidden dangers, in the original machine. A "reconditioner" may, however, be held liable for negligence in its own work. As an example, if a reconditioner were to disassemble a machine with 10 parts and then negligently reassemble it with only eight parts, thereby causing injury, the reconditioner could be held liable under a theory of ordinary negligence.

¶ 42. This case requires us to apply the principles of *Rolph* to a different set of facts. The circuit court determined that Transtech was a reconditioner that did not have a duty to install ladder treads. Judge Curley, in her concurrence in the court of appeals, reached the same conclusion. The court of appeals majority came to a different conclusion. It noted that although Transtech "may have been a reconditioner of the crane by virtue of its work on the ladders, it was not a reconditioner of the ladders; rather, it built and installed new ones." *Strasser*, unpublished slip op. at 7–8. This difference, the majority indicated, put the applicability of *Rolph* into question.

¶ 43. Both conclusions are understandable. On the one hand, Transtech was indisputably a reconditioner of the trailer-mounted cranes. More generally, it was in the business of maintaining and repairing trucks. Transtech was not a manufacturer of ladders. It did not distribute or sell ladders. It had no particular expertise in building ladders. It was not familiar with the safety standards for ladders. It made no representation that it was. Transtech was asked to replace two ladders that were a component of the crane assembly, with requests for improvement. Transtech was not given the time to design, test, and build completely safe ladders. It was not supplied directions, designs, or

safety standards. It told Recycled Fibers that it did not have the materials suggested that might have made the ladders safer. It said that it could not deliver everything that Recycled Fibers requested.

¶ 44. On the other hand, Transtech did build two ladders. It did not merely disassemble parts and then put them back together. It did not replace parts with fungible generic parts. It made new parts. Hence, if there were any defects in the new ladders, it was Transtech that created them, not the original manufacturer. Transtech fabricated two ladders that were sturdier than the original ladders and had wider rungs. It changed the design. As part of this change, the new rungs were deeper than the old rungs, did not have what Strasser described as the "non-slip bars" that were on the old rungs, and were smoother than the old rungs.[9] The circuit court acknowledged "that Mr. Strasser [ ] could give a lay opinion based upon his experience in the field as to the usefulness of the ladder treads" that he requested. Strasser argued: "A jury need not hear from an 'expert' to know that a non-slip rung is safer than a smooth bolt rung." The court of appeals accepted this argument.

¶ 45. This case, then, presents a more difficult fact situation than *Rolph*. In *Rolph*, the reconditioner was charged with not addressing and correcting a defect in the product that the manufacturer had created. Here, the reconditioner is accused of creating a defect in the parts it fabricated.

¶ 46. The real issue is whether fabricating replacement parts for a machine is the functional equivalent of reconditioning the machine when the replacement parts are not the same.

---

[9] The smoothness is a disputed fact. On summary judgment, we accept Strasser's version of the factual dispute.

¶ 47. We conclude that vocationally, Transtech was a reconditioner, but functionally it was not. Transtech did not manufacture, distribute, or sell crane assemblies or ladders. It reconditioned one crane assembly by fabricating two ladders to replace the other ladders. It did not hold itself out as having special expertise to perform this repair work.

¶ 48. If Transtech had remained a pure reconditioner, Transtech would have had no duty to go beyond restoring the crane to its original condition. It would have had no duty on its own to put safety treads on the ladders because safety treads were not part of the original ladders. Transtech would have been required to use ordinary care in its work restoring, renovating, and rebuilding the crane ladders, nothing more.

¶ 49. But Transtech assumed a new role. It ceased to be a functional reconditioner. The circuit court accepted as fact that Recycled Fibers directed Transtech to install safety treads on the new ladders. Recycled Fibers also asked for ladders that were stronger and sturdier than the old ladders. There is no dispute that Transtech made new ladders that were different from the old ladders to accommodate, in part, Recycled Fibers' requests. In some respects, the new ladders were better than the old ladders, even though the new rungs may have been smoother than the old rungs. That is a fact in dispute. In fabricating new ladders, Transtech was no longer "reconditioning" a manufacturer's product. It was building "parts" that were its own product. The facts changed, and therefore the rules have to change with them. Whether Transtech exercised ordinary care when it assumed its new role is quintessentially a jury question.

¶ 50. Transtech's new duty should be put in context. Wisconsin follows the rule that every person owes a duty of care to the world at large to refrain from conduct that could cause foreseeable harms to others. *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 260, 500 N.W.2d 233 (1998). The duty of a defendant is established when it is clear that it was foreseeable that the defendant's act or omission to act might cause harm to someone. *Rolph*, 159 Wis. 2d at 532 (quoting *Schuster v. Altenberg*, 144 Wis. 2d 223, 235, 424 N.W.2d 159 (1988)).

¶ 51. Duty pivots on foreseeability. *Morden v. Continental AG*, 2000 WI 51, ¶ 46, 235 Wis. 2d 325, 611 N.W.2d 659. It is not necessary for a plaintiff to prove that a particular injury is foreseeable; rather, it is sufficient to show that some injury to some person is foreseeable. *Id.* at ¶ 47. It is not unforeseeable that a person who uses a ladder 30 times per day, five days per week, approximately 50 weeks per year, sometimes in rain, potentially in snow, could slip off the ladder, and that ladders designed for such a person must be crafted with ordinary care to prevent slipping. Thus, a jury might find that a traditional manufacturer of the kind of ladders provided to Strasser designed or built them with a lack of ordinary care because there were established ways to make the ladders less slippery.

¶ 52. Transtech, however, was not a traditional manufacturer. It was a reconditioner called upon to undertake an additional service. If this case goes to trial, Transtech should not be treated as a traditional manufacturer unless the facts prove different from how we understand them.

¶ 53. The Civil Jury Instructions for *Negligence: Duty of Manufacturer* provide:

> It is the duty of a manufacturer to exercise ordinary care in the design, construction, and manufacture of its product so as to render such product safe for its intended use.
>
> It is the further duty of the manufacturer, in the exercise of ordinary care, *to make all reasonable and adequate tests and inspections of its product so as to guard against any defective condition which would render such product unsafe* when used as it is intended to be used (emphasis added).

Wis JI—Civil 3240.

¶ 54. These instructions do not apply to Transtech because Transtech was not in the business of manufacturing ladders. On the facts at hand, there was no chance for Transtech to make "reasonable and adequate tests and inspections" of the two ladders so as to guard against any defective condition. The record suggests that Recycled Fibers did not want its crane assembly out of circulation very long. It wanted a speedy repair. Strasser apparently waited for the crane ladders while Transtech worked on them. Recycled Fibers did not ask for an exact duplicate of the old ladders. It wanted Transtech to improvise and to produce new ladders that would be stronger and sturdier than the old ladders.

¶ 55. The test-and-inspect standard in the jury instructions is a standard that a reconditioner pushed to do more may not be able to meet, at least in a short time frame. Hence, there may be situations in which an entity like Transtech does not have the same "duty of care" as a manufacturer, even though it is "fabricating" a "product."

¶ 56. We must remand this case to the circuit court because there are genuine issues of material fact: What exactly did Strasser and Marzo request from Transtech, and when did they request it? How much time did Transtech have to design and build the ladders? How did the new ladders compare with the old ladders? On a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party. When we do that here, we are unable to hold for Transtech as a matter of law. Whether Transtech exercised ordinary care in designing and building the ladders, under the special circumstances of this case, is a question of fact for a jury.

¶ 57. We next discuss Strasser's second cause of action. Strasser contends Transtech negligently failed to provide him with warnings about defects it knew or should have known were present in the ladders. This claim does not have merit.

¶ 58. Each individual is held, at the very least, to a standard of ordinary care in all activities. Where the parties agree upon the facts, the existence of a duty presents a question of law. *Rockweit*, 197 Wis. 2d at 419. The standard of care for a "manufacturer" of a product is to warn of dangers that he or she knows or should know are associated with the proper use of the product. This duty exists whether or not the product was properly designed. The jury instructions for *Negligence: Duty of Manufacturer [ ] to Warn*, provide in part:

> A manufacturer [ ] of a product has a duty to exercise ordinary care to warn of dangers which he or

she knows, or should know, are associated with the proper use of a product. This duty exists whether or not the product was properly designed. "Proper use" means a use which is intended by the manufacturer [ ]. In addition, a manufacturer [ ] has the duty to warn of dangers inherent in a use not intended by the manufacturer [ ] if such unintended use is reasonably foreseeable by the manufacturer [ ].

Wis JI—Civil 3242. These jury instructions reflect our adoption of Restatement (Second) of Torts § 388 (1965). *See Westphal v. E.I. du Pont de Nemours*, 192 Wis. 2d 347, 365, 531 N.W.2d 386 (1995) (citing *Vogt v. S.M. Byrne Constr. Co.*, 17 Wis. 2d 96, 99, 115 N.W.2d 485 (1962), *modified*, 17 Wis. 2d 96, 117 N.W.2d 362 (1962)). Section 388 of the Restatement addresses the duty of a manufacturer to warn in negligence actions:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is likely to be dangerous for the use for which it is supplied, and

(b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and*

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Id.* (citing Restatement (Second) of Torts § 388) (emphasis added). Comment (c) clarifies that this rule "also appl[ies] to one who undertakes the repair of a chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it." Restatement (Second) of Torts § 388, cmt. c. Subsection (b) of § 388 expressly provides that manufacturers are under a duty to warn only if the manufacturer as "no reason to believe" that the user "will realize" the item's dangerous condition. Comment (k) further clarifies this point:

> *When warning of defects unnecessary.* One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. *It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made.*

Restatement (Second) of Torts § 388, cmt. k (emphasis added); *see also Estate of Schilling v. Blount,* 152 Wis. 2d 608, 619–20, 449 N.W.2d 56 (Ct. App. 1989). As the court of appeals noted in *Schilling,* many jurisdictions have adopted comment (k) and do not require manufacturers to warn about commonly known dangers. *Schilling,* 152 Wis. 2d at 620 n.28. This exception recognizes that a warning is not necessary to satisfy the

standard of ordinary care when the condition at issue is known to the user.

¶ 59. In this case Transtech need not have warned Strasser as a matter of law because Transtech had reason to believe that Strasser realized that the ladders had no safety treads. Here there is no dispute about Strasser's knowledge. Strasser knew the day he picked up the repaired crane assembly that the crane ladders did not have stair treads. He discussed the absence of stair treads with others. He slipped twice on the ladders over the ten-week period in which he had the ladders before his injury. In short, Strasser knew everything that Transtech could have told him. It was not necessary for Transtech to inform Strasser about the absence of stair treads because Strasser's actions made clear that "a mere casual looking over" or "casual inspection" disclosed that the treads were not there. In the circumstances of this case, Transtech's failure to warn Strasser about the absence of safety treads in the new ladders was not negligence.

¶ 60. Strasser argues that the question whether ordinary care required Transtech to warn him about the ladders should be presented to a jury because whether a plaintiff confronted an "open and obvious danger" is an element to be considered by the factfinder in apportioning negligence and will not entirely preclude the plaintiff's recovery. *See also Rockweit,* 197 Wis. 2d at 423. We disagree. As our courts consistently recognize:

> Where the facts alleged to give rise to a duty are agreed upon, the question of the existence of a duty is one of law. This question is closely related to the question of whether a defendant is not negligent as a matter of law, *i.e.,* based on the facts presented, no

properly instructed, reasonable jury could find the defendant failed to exercise ordinary care.

*Rockweit*, 197 Wis. 2d at 419 (quoting *Olson v. Ratzel*, 89 Wis. 2d 227, 251–52, 278 N.W.2d 238 (Ct. App. 1979)). The issue of ordinary care, which is the claim Strasser set forth in the pleadings, is distinct from the open and obvious danger doctrine. The doctrine operates as an affirmative defense that allows a jury to allocate a plaintiff's contributory negligence. Whether Transtech failed to exercise ordinary care in the first place is a question of law to be decided in this case by a court. When, as here, we find that no negligence exists, the analysis ceases and the issue does not go before a jury.

¶ 61. We add, however, that if this case reaches a jury on the first issue, namely whether Transtech was liable under principles of ordinary negligence in its fabrication of the ladders, then it would be permissible for the factfinder to consider whether Strasser confronted an open and obvious danger in its negligence allocation.

¶ 62. We therefore hold that Transtech was not negligent in failing to warn Strasser about the condition of the new ladders because Strasser knew about the dangerous condition of the ladders.

## CONCLUSION

¶ 63. We find that this case presents issues of material fact that make summary judgment inappropriate. We hold that Strasser's claim of ordinary negligence in its fabrication of the ladders should be presented to a factfinder for resolution. We conclude, however, that the claim for failure to warn cannot proceed because Transtech was not negligent as a matter

of law in failing to warn Strasser about a condition known to be dangerous. Accordingly, we reverse the decision of the court of appeals and remand the case to the circuit court for trial or further proceedings consistent with this decision.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

¶ 64. JON P. WILCOX, J. *(dissenting).* I agree with the majority that Strasser's claim for negligent failure to warn must fail because Transtech had reason to believe that Strasser knew that the ladders did not have safety treads.

¶ 65. However, I disagree with the majority's conclusion that Strasser's claim for negligent design, manufacture, construction, assembly, and installation of the ladders is viable. I would hold that *Rolph v. EBI Cos.*, 159 Wis. 2d 518, 464 N.W.2d 667 (1991) bars such a claim. Therefore I dissent on that issue.

¶ 66. This court reviews a grant of summary judgment by applying the same methodology as the circuit court, namely, the standards set forth in Wis. Stat. § 802.08(2) (1995–96).[1] *Rolph*, 159 Wis. 2d at 527. Under this methodology, the court first examines the pleadings and decides whether a claim for relief has been stated. *Id.* If so, the court then examines the pleadings, depositions, answers to interrogatories, and admissions on file to determine whether there are issues of material fact that preclude summary judgment. *Id.* If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment should be granted. *Id.*

---

[1] All future references to the Wisconsin Statutes are to the 1995–96 volumes unless otherwise noted.

¶ 67. The pleadings state a claim for relief. The complaint alleges that Strasser was seriously injured when he fell off of a ladder that had been constructed and installed by Transtech. The complaint further alleges that these injuries were caused by Transtech's negligent design, manufacture, construction, assembly, and installation of the ladder. Based on the same facts, the complaint also seeks to hold Transtech liable for negligently failing to warn Strasser about the defects and hazards present in the ladder.

¶ 68. In its responsive pleading, Transtech denies Strasser's allegations. However, Wisconsin recognizes a claim for negligent design or manufacture of a product. *See, e.g., Sharp v. Case Corp.*, 227 Wis. 2d 1, 18–19, 595 N.W.2d 380 (1999). *See also* Wis JI—Civil 3240. Wisconsin also recognizes a claim for negligent failure of a manufacturer or supplier of a product to warn of dangerous conditions in the product. *See* Wis JI—Civil 3242. Thus, the pleadings state claims for relief.

¶ 69. The next step is to examine the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine whether there exist genuine issues of material fact that preclude summary judgment. Wis. Stat. § 802.08(2). We view the facts in the light most favorable to the plaintiff and ask whether under these facts the moving party has demonstrated that it is entitled to judgment as a matter of law. *Morris v. Juneau County*, 219 Wis. 2d 543, 550, 579 N.W.2d 690 (1998).

¶ 70. The facts viewed in the light most favorable to Strasser are these. Recycled Fibers was a recycler that used cranes mounted onto trailers to pick up and move bales of cardboard and other paper materials for recycling. Strasser worked for Recycled Fibers as a

truck driver and crane operator. Strasser operated the crane at issue from a seat about 13 feet in the air. Two ladders were mounted on the sides of the crane to enable the operator to reach the seat.

¶ 71. The ladders mounted on the crane before the accident (the "old ladders") had rungs that consisted of one and one-half inch steel plate. The pieces of steel were positioned so that the narrow edge, which was approximately one-quarter inch in width, pointed up. Grooves were cut into the top of the rung. In other words, a person looking at the old ladders from the front would see the wide, flat side of the steel plate, but a person climbing the ladder would step on a flat, narrow edge with grooves.

¶ 72. The old ladders were not strong enough to sustain the recycling work. They often bent and twisted and became detached from the crane assembly. One of the old ladders on the crane in question had been removed completely. The other was so damaged that it was beyond repair. Although the old ladders were rickety, Strasser testified that he had never slipped on them.

¶ 73. Darryl Frick was the president of Transtech, a mobile fleet maintenance and repair company that had contracted to do certain maintenance and repair work for Recycled Fibers, including maintenance and repair of the company's trailers and cranes. Frick was familiar with the crane in question because Transtech regularly maintained the crane and trailer.

¶ 74. Recycled Fibers asked Frick to put new, sturdier ladders on the crane in question. Recycled Fibers told Frick that it wanted sturdier ladders and that it wanted safety treads on the rungs. Frick knew that it was important that the steps not be slippery, because hydraulic fluid from the crane sometimes

leaked onto the steps and because the operators sometimes had to climb the ladder in the rain. However, Frick specifically informed Recycled Fibers that he did not have the material to make safety treads and did not know where to get it.

¶ 75. On approximately March 29, 1994, Frick fabricated new ladders for the crane, without stair treads. He fabricated new uprights from three-inch square tubing. He constructed new rungs made out of trailer U-bolts, which are large threaded bolts in the shape of a "U". Frick cut the "U" off of each bolt, leaving two straight sections. When these sections were installed into the new ladders as rungs, about three-quarters of each rung was covered with threaded grooves. Approximately two and one-half inches of each rung was smooth.

¶ 76. It is undisputed that Recycled Fibers took the completed crane and began using it, despite the fact that Frick had been unable to install safety treads on the ladder rungs. In addition, Strasser admits that the new ladders were stronger and sturdier than the old ones and that the new rungs provided a wider footing.

¶ 77. Strasser's complaint is that the new ladders were more slippery than the old ones. He claims that after Frick installed the new ladders, he experienced problems with slipperiness. He alleges that he told his supervisor and a dispatcher at Recycled Fibers about these problems. In addition, Frick could not rule out the possibility that Strasser mentioned having slipped on the new ladder. However, it is undisputed that Recycled Fibers did not return the ladder to Frick for installation of safety treads.

¶ 78. On June 7, 1994, a drizzly day, Strasser slipped on the bottom rung as he was climbing down

the ladder. He fell four and one-half feet to the pavement and seriously injured his right knee. He seeks to hold Transtech liable for his injury on the theory that Transtech negligently designed and manufactured the ladder.

¶ 79. As already noted, Wisconsin recognizes a claim for ordinary negligence in design, construction, and manufacture of a product. *See Sharp*, 227 Wis. 2d at 18–19 (discussing causes of action for negligent manufacture and strict products liability). *See also* Wis JI—Civil 3240. Moreover, a person who negligently completes a repair may be liable under ordinary principles of negligence. *Colton v. Foulkes*, 259 Wis. 142, 147–48, 47 N.W.2d 901 (1951).

¶ 80. However, this court may preclude an ordinary negligence claim when public policy considerations lead to the conclusion that liability " ' "would shock the conscience of society." ' " *Rolph*, 159 Wis. 2d at 534 (citations omitted). The public policy considerations include: (1) whether the injury is too remote from the negligence, (2) whether the injury is too wholly out of proportion to the tortfeasor's culpability, (3) whether in retrospect it seems too extraordinary that the negligence would have resulted in the harm, (4) whether allowing recovery would place too unreasonable a burden on the tortfeasor, (5) whether allowing recovery would open the way for fraudulent claims, and (6) whether allowing recovery would enter a field that has no sensible or just stopping point. *Id.* at 534 (quoting *Coffey v. Milwaukee*, 74 Wis. 2d 526, 541, 247 N.W.2d 132 (1976)).

¶ 81. Based on these public policy concerns, this court held in *Rolph* that a reconditioner of machinery has no duty to bring machines into compliance with applicable safety standards unless the reconditioner

holds itself out as bringing machines into compliance with safety standards or is requested to do so by the machine's owner. *Rolph*, 159 Wis. 2d at 524. Transtech argues that *Rolph* bars Strasser's claims.

¶ 82. The plaintiff in *Rolph* was injured when his hand got caught in a "bending roll" machine. *Id.* at 523–25. The plaintiff brought claims against the manufacturer of the machine for strict products liability, negligent design and manufacture, and negligent failure to warn. *Id.* at 525. The manufacturer brought a third-party action against a company that had reconditioned the machine approximately two years before the plaintiff's injury. *Id.* Reconditioning of the machine was understood to mean "disassembly, cleaning, inspecting parts for wear, and *replacing certain parts*." *Id.* at 526 (emphasis added).

¶ 83. This court held that strict products liability could not be imposed on the reconditioner because a reconditioner is not a manufacturer. *Id.* at 532.

¶ 84. Furthermore, this court rejected the ordinary negligence claim against the reconditioner, on grounds of public policy. *Id.* at 535. We explained that "[i]mposing liability on [the reconditioner] for failing to correct a design defect simply because it reconditioned the machine would make all repairers who disassemble a product in order to repair it insurers against design defects created by manufacturers." *Id.* Recovery would contravene public policy because it would enter a field with no sensible or just stopping point. *Id.* at 535–36. Therefore there was no duty on the part of the reconditioner to correct design flaws in a machine unless the reconditioner either held itself out as a business that would bring machines into compliance with specific safety standards, or was requested to bring the

469

machine into compliance with such standards. *Id.* at 536–37.

¶ 85. Like the reconditioner in *Rolph*, Transtech was not a manufacturer, seller, or supplier of cranes or ladders. Transtech was merely a repairer or reconditioner. Recycled Fibers asked Transtech to construct replacement ladders for the crane assembly in a limited period of time. Although Recycled Fibers asked for stair treads, there were no such treads on the old ladders, and Frick informed Recycled Fibers that he did not have any material with which to make such treads.

¶ 86. Under these circumstances, as in *Rolph*, public policy should bar Strasser's claim. Imposing liability on Transtech under these circumstances runs the risk of exposing every business that repairs equipment to liability if parts must be fabricated to complete the repair. *See Rolph*, 159 Wis. 2d at 535–36 ("Every business that services equipment would be exposed to liability if the repair required disassembly of the product."). Repairers would be exposed to an unreasonable burden and would be discouraged from engaging in preventative maintenance and repair. As in *Rolph*, "[s]uch liability would shock the conscience of society because it would have no sensible or just stopping point." *Id.* at 536.

¶ 87. The majority contends that *Rolph* is distinguishable because while the reconditioner in *Rolph* only restored a machine to its original condition, Transtech built new ladders for the crane with different rungs. Majority op. at ¶¶ 45–49. However, as Judge Curley stated in her concurrence in the unpublished decision of the court of appeals,

> Frick's role in replacing the ladders on the crane is similar to that of the machine repairman in *Rolph*

who disassembled, cleaned, inspected parts for wear and replaced certain parts. The only significant difference in the facts here and the *Rolph* scenario is the size of the products fixed by the repairmen. . . .[2]

It seems likely that repairers are often unable to obtain original parts for equipment and therefore fabricate replacement parts. For example, a bicycle repair shop that is unable to obtain an original replacement part might fabricate a replacement. If the replacement part failed and resulted in damages, under the majority's theory the shop could be held liable for "negligent manufacture" or "negligent design" of the replacement part, even if the bicycle owner took delivery of the bicycle with full knowledge that a fabricated part had been installed to make do in a pinch.

¶ 88. The majority itself admits that the line between "reconditioning" and "manufacture" is quite a narrow one. Majority op. at ¶ 43 (admitting that it is "understandable" to conclude that Transtech was a reconditioner that did not have a duty to install ladder treads). Liability should not turn on such a fine distinction.

¶ 89. It is clear that neither of the exceptions set forth in *Rolph* apply to this case. Transtech did not hold itself out as a business that could bring equipment into compliance with safety standards, and Recycled Fibers did not request that Transtech make the ladders compliant with any particular standards. *See Rolph*, 159 Wis. 2d at 537 (explaining that failure to meet specific safety standards may provide a basis for negligence if the reconditioner holds itself out as bringing machines

---

[2] *Strasser v. Transtech Mobile Fleet Serv. Inc.*, No. 98–1581, unpublished slip op. (Wis. Ct. App. Aug 31, 1999)(Curley, J., concurring).

into compliance with present engineering standards, or is requested to bring a particular machine into compliance with such standards).

¶ 90. Under these conditions, this court should adhere to precedent and hold that *Rolph* bars Transtech's claim. Accordingly, I dissent.

¶ 91. I am authorized to state that Justice N. PATRICK CROOKS joins this dissent.