Michael J. Mohr, Jeffrey T. Mohr and Kathy D. Mohr, Plaintiffs-Appellants,

State of Wisconsin Department of Health and Family Services, Sheboygan County Department of Health and Human Services and Plastics Engineering Group Health Plan, Plaintiffs,

v.

St. Paul Fire & Marine Ins. Co., Wisconsin Interscholastic Athletic Association, United National Ins. Co. and KDI Paragon, Inc., Defendants-Respondents,†

National Union Fire Ins. Co. of Pittsburgh and National Federation of State High School Associations, Defendants,

West Bend Mutual Ins. Co., Defendant-Respondent,

Walters' Swim Supplies, Inc., Defendant.

Court of Appeals

*No. 02–1728. Submitted on briefs June 9, 2003.— Decided December 18, 2003.*

2004 WI App 5

(Also reported in 674 N.W.2d 576.)

† Petition to review denied 3-23-04.

303

309

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Mark S. Young, Virginia M. Antoine,* and *Molly C. Lavin, Habush Habush & Rottier, S.C.,* Milwaukee.

On behalf of the defendants-respondents Wisconsin Interscholastic Athletic Association and St. Paul Fire & Marine Ins. Co., the cause was submitted on the brief of *Samuel J. Leib, Douglas S. Knott,* and *Katherine A. Kuchan, Leib & Katt, S.C.,* Milwaukee.

On behalf of the defendants-respondents United National Insurance Company and KDI Paragon, Inc., the cause was submitted on the brief of *Donald H. Carlson, Mary E. Nelson,* and *Ryan G. Braithwaite, Crivello, Carlson & Mentkowski, S.C.,* Milwaukee.

Before Deininger, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. Michael Mohr was injured while practicing a racing start from a starting platform at the shallow end of his high school's swimming pool. He[1] appeals the summary judgment in favor of the manufacturer of the platform, KDI Paragon, Inc., and the Wisconsin Interscholastic Athletic Association (WIAA). He contends there are disputed issues of fact on his negligence and strict product liability claims

---

[1] Michael's parents are also plaintiffs and appellants, although we refer only to Michael.

against KDI and on his negligence claim against the WIAA and he is therefore entitled to a jury trial.

¶ 2. We conclude there are disputed issues of fact on Mohr's negligence and strict product liability claims against KDI, as well as on his negligence claim against the WIAA. We also conclude the trial court erred in granting summary judgment in the WIAA's favor on public policy grounds. We therefore reverse and remand for a trial on these claims.

## BACKGROUND

¶ 3. Certain of the background facts are not disputed. At the time of the accident in February 1997, Mohr was on the Sheboygan North High School varsity swim team. The shallow end of the pool is 3.5 feet deep and there are six starting platforms at that end, all purchased in 1991 and manufactured by KDI. The platforms are eighteen inches high. At the time of the purchase of the platforms, they contained a label stating: "FOR USE BY TRAINED COMPETITIVE SWIMMERS ONLY. EXECUTE SHALLOW RACING DIVES ONLY. IMPACT WITH POOL BOTTOM CAN CAUSE SERIOUS INJURY." Mohr had used the starting platforms on many occasions. When the accident occurred, he was warming up prior to his team's supervised practice. He had taken one dive off a platform into the pool and dove again, apparently striking his head on the pool bottom.

¶ 4. At the time of the accident, a rule promulgated by the National Federation of State High School Associations (Federation), Rule 2–7–2, provided as follows:

311

SECTION 7 Equipment for Swimming Events

ART. 2. Starting Platforms.

| Water Depth at Starting End | MAXIMUM Height of Platforms/Deck Above Water Surface |
| --- | --- |
| 4' or more | 30" |
| 3 ½ - 4' | 18" **or** Start from deck/in water |
| Less than 3 ½' | Start **in** water |

The Federation is an association of state athletic associations, including the WIAA. The Federation formulates and publishes rules governing competition (playing rules) in interscholastic sports, including swimming and diving. The Federation promulgated the current Rule 2–7–2 in 1991 after learning of serious injuries to swimmers using starting platforms in shallow water. The 1996–97 Federation rule book, like prior Federation rule books, included this "Point of Emphasis":

> **Water Depth in Starting End:** Issues of participant safety have been a primary issue of concern. Over the years water depth and starting platform height have been subjects of review and discussion.
>
> The risk of injury however, is an inherent aspect of "dives" into a pool. Supervisory personnel should direct swimmers on how and when to enter the water in a safe and prudent manner.

Before 1991 the applicable Federation rule had permitted thirty-inch starting platforms for pools with water depths of 3.5 feet or less.

¶ 5. The WIAA is a voluntary association of Wisconsin high schools that coordinates and promotes interscholastic athletic competition among Wisconsin schools. The WIAA is not required by the Federation to adopt the Federation's playing rules, but the WIAA's general policy is to do so for all sports. In 1996–97, the WIAA adopted Rule 2–7–2. It did not make recommendations to any school district or participant on which option to choose of those specified in the rule.

¶ 6. Mohr's complaint alleged that KDI was negligent and the platform defective and unreasonably dangerous because KDI failed to warn purchasers and users: (1) that serious injuries could result if the starting platforms were placed at the shallow end of a pool, (2) that the platforms should be placed at the deep end of the pool, and (3) about the types of dives swimmers should avoid if the starting platforms were placed at the end of a swimming pool where the water depth is 3.5 feet. Against the Federation, Mohr alleged negligence in promulgating Rule 2–7–2 and in leading its members to believe its rules were safe. Against the WIAA, Mohr alleged negligence in adopting Rule 2–7–2, in requiring its members to follow the rule, in leading its members to believe it was safe to use platforms with 3.5 feet of water, and in encouraging them to do so.

¶ 7. The three defendants moved for summary judgment. The trial court denied the Federation's motion and granted the motions of KDI and the WIAA. With respect to the Federation, the court held that it had a duty to promulgate a safe rule, it was foreseeable that injuries could result if the rule were wrong, and there were disputed issues of fact whether the Federation was negligent in promulgating the rule.

¶ 8. With respect to KDI, the court decided as a matter of law that KDI was not negligent for the

313

following reasons: KDI sold these platforms to athletic directors, the platforms were used by experienced swimmers, there had been no accidents at the school with this platform, the warning on the platform satisfied KDI's duty of reasonableness, and KDI had no duty to "look beyond" the Federation's rule on what was safe. For essentially the same reasons, the court also decided as a matter of law the platform was not defective due to an inadequate warning; in addition, the court stated, everyone, including Mohr, knew there was a danger in using the product.

¶ 9. In granting summary judgment in favor of the WIAA, the court ruled the WIAA was not negligent because it was simply a conduit for the Federation rule, it acted reasonably in relying on the expertise of the Federation, harm to Mohr resulting from the WIAA's adoption of the rule was not foreseeable, and the rule did not mandate use of starting platforms. Alternatively, the court ruled, the negligence claims against the WIAA should be dismissed on grounds of public policy because liability was out of proportion to the WIAA's conduct and would impose a "horrendous obligation" on state athletic associations.

## DISCUSSION

¶ 10. A party is entitled to summary judgment if there are no genuine issues of material fact and that party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2001–02). We apply the same methodology as the trial court and review de novo the grant or denial of summary judgment. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). In deciding whether there are genuine issues of material fact, we view the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Burkes v. Klauser*, 185 Wis. 2d 308, 328, 517 N.W.2d 503 (1994).

*Claims Against KDI*

1. Negligence

¶ 11. Wisconsin has adopted RESTATEMENT (SECOND) OF TORTS § 388 (1965) regarding a manufacturer's duty to warn about its products.[2] *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶ 58, 236 Wis. 2d 435, 613 N.W.2d 142. This section provides:

> Chattel Known to be Dangerous for Intended Use.
>
> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

---

[2] RESTATEMENT (SECOND) OF TORTS § 388 addresses the duty of a supplier of chattel, but RESTATEMENT (SECOND) OF TORTS § 394 provides that the duty of a manufacturer is the same as the duty of a supplier of chattel.

RESTATEMENT (SECOND) OF TORTS § 388.

¶ 12. Mohr contends the trial court erred in granting summary judgment to KDI because there were disputed issues of fact concerning whether KDI exercised reasonable care in not warning the high school that a minimum of five feet of water was needed in order to safely use the platform. In support of his position, Mohr submitted opinion evidence that it is unreasonably dangerous to perform any competitive racing start from a platform of any height in water less than five feet deep. According to one of Mohr's experts, because of variability in size, skill, and human nature, any swimmer performing a competitive racing dive has the potential of going as deep as 4.5 feet; with water depth of 3.5 feet, the risk of striking the pool bottom and sustaining a catastrophic injury is essentially the same whether the swimmer performs a racing start from a thirty-inch platform or an eighteen-inch platform, because it is the water depth, not the height of the platform, that is critical.

¶ 13. Mohr also asserts that KDI had a duty to warn him, although in his main brief he does not differentiate between that duty and KDI's duty to warn the high school about the safe water depths for use of the platform. In his reply brief, Mohr points to the allegations in the complaint that KDI failed to warn users and purchasers about the types of dives that swimmers should avoid if the starting platforms were placed at the end of a swimming pool where the water depth is 3.5 feet. However, in neither brief does Mohr point to evidence in the record that there were certain types of dives KDI should have warned purchasers or swimmers to avoid and that its failure to warn of these dives caused Mohr's injury. Indeed, such a position is flatly inconsistent with the evidence Mohr presented—

316

that he was doing precisely the flat racing start he had been taught by his coaches—and with his assertion that he was using the starting platform exactly as intended by KDI. In addition, Mohr does not explain why KDI had a duty to inform swimmers of the depth of water necessary for safe use of the platforms. There is no evidence that the swimmers had any role in choosing where to locate the platforms or that they could move the platforms once the high school installed them. Accordingly, we confine our analysis to Mohr's argument that KDI was negligent in failing to warn the high school that a minimum of five feet of water was needed in order to safely use the platforms.

¶ 14. In response, KDI contends that it did not have a duty to warn the school about the depth of water necessary for safe use of the platforms because the high school was knowledgeable on the topic and because the danger of injury was open and obvious. On these two points, according to KDI, there are no facts in dispute. KDI does not contend there are no disputed facts on the question of the minimum depth at which the platforms can be used safely for competitive racing starts. Therefore, for purposes of analyzing KDI's two defenses, we will assume the view of the evidence on safe water depth most favorable to Mohr—that at least five feet of water is needed to safely use the eighteen-inch platforms for competitive racing dives.

¶ 15. Whether KDI had a duty to warn the high school given the school's level of knowledge implicates RESTATEMENT (SECOND) OF TORTS § 388(b). Under this subsection, KDI did not have a duty to warn the high school that the platforms were likely to be dangerous when used in water less than five feet if KDI had "reason to believe" that the high school would realize that danger. When this subsection is applied in the

317

context of a user who allegedly has the knowledge to realize the dangerous condition of the product, it is often called the "sophisticated user" doctrine. *See Haase v. Badger Mining*, 2003 WI App 192, ¶ 21, 266 Wis. 2d 970, 669 N.W.2d 737. In *Haase*, we considered § 388(b) in the context of a negligence claim that the supplier of silica sand failed to adequately warn the foundry about the dangers of inhaling silica dust from the sand. *Id.*, ¶¶ 1, 21. The supplier had successfully moved in the trial court for dismissal at the close of the plaintiff's case on the ground that the supplier reasonably expected the foundry, a sophisticated user of the sand, to institute the necessary safeguards for its employees. *Id.*, ¶¶ 13–14. We rejected the plaintiff's argument that Wisconsin law does not recognize the "sophisticated user" doctrine and concluded that, based on the evidence the plaintiff presented, there was no dispute that the foundry, with whom the supplier had been dealing for years, had extensive knowledge of the hazards of inhaling silica dust, the disease of silicosis, and proper duct control methods. *Id.*, ¶ 24. We therefore concluded it was reasonable for the supplier to expect that the foundry would institute the necessary safety precautions. *Id.*[3]

■

¶ 16. Mohr contends that *Haase* does not support the application of a sophisticated user defense in this case because *Haase* addressed an employer-employee situation and did not hold the defense was appropriate in other situations. We do not agree. While it is true

[3] *Haase v. Badger Mining*, 2003 WI App 192, 266 Wis. 2d 970, 669 N.W.2d 737, was decided after the parties in this case completed their briefs on appeal; both KDI and Mohr submitted commentary on the application of *Haase* to this case.

that some of our reasoning in *Haase* related specifically to the workplace,[4] the broader analysis was that the sophisticated user doctrine was "embodied" in RESTATE-MENT (SECOND) OF TORTS § 388, which Wisconsin had adopted. *Id.*, ¶ 21. We can see no reason to limit the application of subsec. (b) to an employer. This subsection is simply an expression of the general negligence principle that what is reasonable depends on the circumstances. *Gritzner v. Michael R.*, 2000 WI 68, ¶ 22, 235 Wis. 2d 781, 611 N.W.2d 906 (" 'Ordinary care is the care which a reasonable person would use in similar circumstances.' ") (quoting WIS JI—CIVIL 1005). Thus, what the supplier or manufacturer had reason to know of the user's or purchaser's knowledge of the dangers of a product affects whether the supplier or manufacturer exercised reasonable care with respect to warnings about the product. We therefore conclude KDI may raise as a defense under § 388(b) that KDI had reason to believe the high school would realize the platforms were likely to be dangerous if used in less than five feet of water.[5]

---

[4] For example, we observed that the purchaser employer was in the best position to ensure workplace safety and it was therefore sound policy to place the duty to warn on that entity rather than the supplier of the material. *Haase*, 669 N.W.2d 737, ¶ 21.

[5] Mohr also argues that the sophisticated user defense does not apply to Mohr himself. KDI does not contend that it does. However, as we have explained above, Mohr has not developed an argument that KDI was negligent in failing to warn Mohr as opposed to the high school, and therefore it is of no consequence that this defense does not apply to Mohr.

¶ 17. We next examine the evidence to determine whether there are disputed issues of fact on this point. The athletic director at the high school from 1986 to 1994 averred that he was responsible for deciding to purchase the eighteen-inch platforms from KDI and to use them in the shallow end of the pool; he made that decision in consultation with the school district staff and the principal. In making that decision, he relied on the Federation's rule and the WIAA's adoption of the rule because he understood they were promulgating the safest rules. Since the rule gave high schools the option of using eighteen-inch platforms in a minimum of 3.5 feet of water, he believed the organizations had evaluated that option and concluded it was safe. He also relied on KDI's advertising literature for the eighteen-inch platforms, which quoted from the Federation's then-new rule, "In pools with water depth less than 4 ft. at the starting end, starting platforms shall be no more than 18" above the water surface or be located at the deep end of the pool," and then stated: "Limit your risk. Also let your team become accustomed to the new racing height now." Prior to Mohr's injury, the athletic director had no knowledge of research reporting injuries to competitive swimmers performing forward racing dives from starting platforms, of the depths swimmers may reach in executing such dives, or of the minimum depths needed to provide a margin of safety. He had no knowledge that organizations other than the Federation and the WIAA had greater minimum depths.

¶ 18. The girls' swimming coach at the high school was involved with the athletic director in discussions concerning purchase of the eighteen-inch platforms after learning at the WIAA meeting that Rule

2–7–2 had been changed. She wrote a memo regarding the need to make a change to comply with the new rule because the platforms the school had then were at the shallow end of the pool and were 25.5 inches high. This coach testified that at the time of the rule change, she had heard there had been several serious injuries to swimmers diving off starting platforms, and she understood this was the reason for the rule change, but she did not know the specifics of those accidents. She also testified that Chuck Walters of Walters Swim Supplies, Inc., with whom she had previously done business, recommended the eighteen-inch platforms so that the school would be in compliance with the Federation and the WIAA rule, and she relied on his recommendation because he had more knowledge of starting platforms than she did.

¶ 19. According to KDI, because this evidence shows that the high school employed "swimming professionals," was a member of organizations providing "swimming expertise," and the swimming coach was aware generally of the risks of injury from racing dives from starting platforms, KDI had no duty as a matter of law to warn the school. We disagree.

¶ 20. We first observe that the issue under RESTATEMENT (SECOND) OF TORTS § 388(b), correctly framed, is whether *KDI had reason to believe* that the high school had knowledge the platforms were likely to be dangerous if used in less than five feet of water, not whether the high school actually did have that knowledge. Thus, the actual knowledge of this particular high school is relevant if KDI knew of it or if the knowledge of this high school may be reasonably inferred to be the knowledge of high schools in general who purchase this product; but, in and of itself, this high school's actual knowledge is not dispositive under § 388(b). This read-

321

ing of § 388(b) is consistent with *Haase*, in which we framed the issue as whether it was "reasonable for [the supplier] to expect that [the foundry] would institute the necessary safety precautions based on its own specific use of [the supplier's] sand." 669 N.W.2d 737, ¶ 24.[6]

¶ 21. With this clarification, we examine the evidence. There is very little evidence on what KDI had reason to believe regarding the knowledge of this high school or high schools in general on the safe water depths for these platforms. There is no evidence that KDI knew of this high school's level of knowledge on safe water depths, and the evidence, in any event, is that the coach who participated in the decision to purchase the platforms had very little knowledge on the subject and the athletic director had none. However, one can reasonably infer from the evidence that KDI knew high schools in general belonged to the Federation and knew that the Federation considered safe

---

[6] Our reading of RESTATEMENT (SECOND) OF TORTS § 388(b) is also consistent with *Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 686, 280 N.W.2d 226 (1979), on which KDI relies. In that case, the court concluded the manufacturer of a conveyor belt did not have a duty to warn the foundry that purchased the conveyor belt of dangers regarding the controls, because it was the foundry's own engineering department that designed and placed the controls. *Id.* The court did not cite to § 388(b), but stated: "Ordinarily there is no duty to warn members of a trade or profession about dangers generally known to that trade or profession." *Id.* It is not the mere fact that a user of a product is a member of a trade or profession that is significant—as portions of KDI's argument suggest—but that the trade or profession, in general, has knowledge of the danger of the product. In such a situation, there is a reason for the supplier or manufacturer to believe that a member of the trade or profession will realize the danger of the product.

water depths in making the rule change on platform heights. From this one might reasonably infer that KDI had a reason to believe the Federation would make available to member schools the information the Federation considered on safe water depths with eighteen-inch platforms. However, that is not the only reasonable inference: since there is no specific evidence that the Federation shared the information with high schools, one could also conclude KDI did not have a reason to believe high schools in general were knowledgeable on the topic of safe water depths for these platforms. We therefore conclude that KDI is not entitled to summary judgment on this ground.

¶ 22. We now turn to KDI's assertion that it is entitled to summary judgment because, as a matter of law, diving into shallow water is an open and obvious danger. KDI appears to rely on the "open and obvious danger" doctrine both as a reason it did not have a duty to warn, beyond the warning that was on the platforms, and as a basis for finding that Mohr was more negligent than KDI.

¶ 23. The open and obvious danger doctrine is distinct from the question of whether a supplier or manufacturer exercised ordinary care under RESTATEMENT (SECOND) OF TORTS § 388 with respect to warnings. *Strasser*, 236 Wis. 2d 435, ¶ 60. The open and obvious danger doctrine is an affirmative defense and an element to be considered by the fact finder in apportioning negligence, if the supplier or manufacturer has failed to exercise ordinary care. *Id.* However, because the duty to warn depends under § 388(b) on whether the supplier or manufacturer has reason to believe the user will realize the danger involved, some of the facts relevant

to an open and obvious danger defense may be relevant to the issue of the supplier's or manufacturer's duty. As the court explained in *Strasser*, one of the situations under § 388(b) in which a supplier or manufacturer has no duty to warn of a danger is when " 'a mere casual looking over will disclose [the dangerous condition] unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made.' " *Id.*, ¶ 58 (quoting RESTATEMENT (SECOND) OF TORTS § 388 cmt. k). When danger is obvious from a mere casual looking over, the supplier or manufacturer has reason to believe that the user will realize the danger. *See id.*, ¶ 59.

¶ 24. In this case, whether a "mere casual looking over" would disclose the likely danger of using the platforms in less than five feet of water is one of the issues in determining whether KDI had a duty to warn the high school of that danger, whereas whether doing competitive racing starts from the platforms located at a depth of 3.5 feet is an open and obvious danger is an issue in allocating negligence, if the negligence issue is resolved against KDI.

¶ 25. As to the first issue, we conclude there are factual disputes. The testimony KDI relies on is that of Mohr and some swimming coaches at his school that they were aware of the need to do shallow racing dives from the platforms in order to avoid hitting the bottom of the pool. However, it is not clear from this testimony whether they understood that there was a danger of injury in diving from the platforms into 3.5 feet of water even if one executed a proper shallow racing dive, which is what Mohr is contending. In addition, it is reasonable to infer from other testimony of the girls' swimming coach that she was not aware of this. Finally, Mohr submitted testimony from his expert that the danger of

doing a shallow racing dive from an eighteen-inch starting platform in 3.5 feet of water would not be obvious to coaches.

¶ 26. As to the issue whether there is an open and obvious danger for purposes of allocating negligence, we also conclude there are disputed issues of fact. There is conflicting evidence on whether Mohr was executing the type of shallow racing dive he was taught to do when he was injured or instead was attempting to dive into the water at a steeper angle. There is also, as we have noted above, a conflict in the evidence over whether Mohr understood that there was a danger in 3.5 feet of water even if he did the shallow racing dive as he had been instructed. Finally, from the evidence that the school placed the platforms at the shallow end of the pool specifically for the use of swimmers like Mohr, one can infer that he reasonably believed it was not dangerous to do a shallow racing dive from the platforms as he had been taught by his coaches.

¶ 27. KDI relies on cases in which the court granted summary judgment[7] or a motion to dismiss[8] against persons who dove into water of unknown depths, concluding that they confronted an open and obvious danger as a matter of law. These cases are not applicable. Mohr was supposed to be doing a shallow racing dive off the platform into the water, which everyone knew was 3.5 feet deep. Whether he was negligent in the manner in which he dove is, at this stage, in dispute; but there is no basis for concluding as a matter of law that he acted unreasonably in diving into the pool.

[7] *Griebler v. Doughboy Recreational Inc.*, 160 Wis. 2d 547, 466 N.W.2d 897 (1991); *Colip v. Travelers Ins. Co.*, 141 Wis. 2d 363, 415 N.W.2d 525 (Ct. App. 1987).

[8] *Scheeler v. Bahr*, 41 Wis. 2d 473, 164 N.W.2d 310 (1969).

¶ 28. The parties also debate whether, if Mohr did confront an open and obvious danger, he would on that basis be more negligent than KDI as a matter of law or if that would be only a factor in allocating negligence. Because this issue will likely arise at trial, we address it now.

¶ 29. KDI relies on *Wagner v. Wisconsin Municipal Mutual Insurance Co.*, 230 Wis. 2d 633, 638, 601 N.W.2d 856 (Ct. App. 1999), for the proposition that "[w]ithin the context of comparative negligence principles, the application of the open and obvious danger doctrine is tantamount to a determination that the plaintiff's negligence exceeds the defendant's negligence as a matter of law." However, this statement is difficult to reconcile with the supreme court's holding in *Rockweit v. Senecal,* 197 Wis. 2d 409, 423, 541 N.W.2d 742 (1995), in which the supreme court reaffirmed that it had in previous cases

> abrogated the common law immunity [for owners of premises] by subsuming the concept of open and obvious danger into the consideration of common law negligence. In the ordinary negligence case, if an open and obvious danger is confronted by a plaintiff, it is merely an element to be considered by the jury in apportioning negligence and will not operate to completely bar the plaintiff's recovery.

The statement from *Wagner* is also inconsistent with *Strasser*, which relied on *Rockweit* in explaining the distinction between the question of ordinary care and the open and obvious danger doctrine, and expressly recognized that "the doctrine operates . . . to allocate a plaintiff's contributory negligence." 236 Wis. 2d 435, ¶ 60. When a decision from this court conflicts with a

decision of the supreme court, the latter controls. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). We therefore follow *Rockweit* and *Strasser*. Under those cases, whether Mohr confronted an open and obvious danger in diving into the pool is an element for the jury to consider in deciding if and to what extent he is contributorily negligent. The determination that he did confront an open and obvious danger does not result in a conclusion as a matter of law that he was more negligent than KDI.

2. Strict Product Liability

¶ 30. Since 1967 Wisconsin has adhered to the rule of strict product liability set forth in RESTATEMENT (SECOND) OF TORTS § 402A (1965).[9] *Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, ¶ 23, 245 Wis. 2d 772,

---

[9] RESTATEMENT (SECOND) OF TORTS 402A (1965) provides:

Special Liability of Seller of Product for Physical Harm to User or Consumer.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his [or her] property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his [or her] property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his [or her] product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

629 N.W.2d 727. To prevail on a claim of strict product liability, a plaintiff must prove all the following elements:

> (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause . . . of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he [or she] sold it.

*Id.*

¶ 31. Wisconsin has adopted comments g and i to RESTATEMENT (SECOND) OF TORTS § 402A. *Green*, 245 Wis. 2d 772, ¶ 29. These explain that a product is defective if it is "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him [or her]"; and that for a product to be considered "unreasonably dangerous," it must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 402A, cmts. g & i (1965)).

¶ 32. " 'In order to prevent [a] product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.' " *Westphal v. E.I. du Pont de Nemours & Co.*, 192 Wis. 2d 347, 363, 531 N.W.2d 386 (Ct. App. 1995) (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. j).

A warning is required when the seller has "reason to anticipate that danger may result from the particular use . . . and a product sold without such warning is in a defective condition." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. h). The warning must be adequate and appropriate under the circumstances. *Tanner v. Shoupe*, 228 Wis. 2d 357, 367, 596 N.W.2d 805 (Ct. App. 1999). A manufacturer must anticipate the environment that is normal for the use of the product. *Id.* In other words, the manufacturer has the duty to foresee all reasonable uses and misuses and the resulting foreseeable dangers. *Id.* The duty to warn arises when the manufacturer has, or should have, knowledge of a dangerous use. *Id.* An inadequate warning on a product can, by itself, render the design defective. *Id.* Whether a warning is adequate is generally an issue of fact to be determined by the jury. *Id.* The jury is to consider all pertinent factors, such as the likelihood of a particular accident taking place and the seriousness of the consequences, in deciding whether the warning is sufficient to apprise the user of the particular hazard.[10] *Id.*

---

[10] Because we determine whether a warning is required on a strict product liability claim by considering whether the seller has reason to anticipate that danger may result from the particular use, RESTATEMENT (SECOND) OF TORTS § 402A cmt. h, this court and the supreme court have used the phrase "duty to warn" for strict product liability claims. *See Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 738, 742–43, 218 N.W.2d 279 (1974), *Tanner v. Shoupe*, 228 Wis. 2d 357, 367–68, 596 N.W.2d 805 (Ct. App. 1999), *Westphal v. E.I. du Pont de Nemours & Co.*, 192 Wis. 2d 347, 362, 531 N.W.2d 386 (Ct. App. 1995), *Krueger v. Tappan Co.*, 104 Wis. 2d 199, 206–07, 311 N.W.2d 219 (Ct. App. 1981). Using "duty" terminology blurs the distinction between a negligence claim and a strict product liability claim when the issue is the adequacy of a warning. Indeed, this court has stated that

¶ 33. Mohr contends there are disputed issues of fact on the adequacy of the warning on the platform.

the proof requirements for an inadequate warning on a strict product liability claim are the same as for breach of the duty to warn on a negligence claim. *Tanner*, 228 Wis. 2d at 365 n.3, *see also Krueger*, 104 Wis. 2d at 207 n.3.

We recognize that there is language in *Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727, that appears inconsistent with defining the need for a warning in terms of whether the seller had reason to anticipate danger from a particular use. In *Green,* in the context of a claim that a product was defective and unreasonably dangerous because of excessive amounts of a particular substance, the court declined to replace the consumer contemplation test. In emphasizing the distinction between negligence and strict product liability, the court quoted earlier cases stating, "It is not necessary [in a strict product liability case] to show duty in terms of foreseeability," and "[f]oreseeability is not an element considered in strict product liability claims, but instead is an element of negligence." *Green*, 245 Wis. 2d 772, ¶¶ 57, 61 n.14 (citations omitted). The dissent in *Green* pointed out what it viewed as the inconsistency in the consumer contemplation test and the standard applied when the product is allegedly defective because of an inadequate warning. *Id.*, ¶¶ 130, 133 & n.3 (Sykes, J., dissenting).

Because *Green* did not specifically address a defect resulting from an inadequate warning, we do not read *Green* to overrule the cases from this court that hold, based on RESTATEMENT (SECOND) OF TORTS § 402A cmts. h & j, that a warning is required when the seller has reason to anticipate that danger may result from the particular use. We therefore use that standard here. The question remains, however, whether there is any practical significance between the elements of a claim that a seller has breached its duty to warn under RESTATEMENT (SECOND) OF TORTS § 388 and a claim that the seller is strictly liable under § 402A because its product was defective and unreasonably dangerous

His position is that the warning was inadequate because neither the label on the product nor the instructions contained information that five feet of water was needed to use the platform safely and, thus, the platform was defective and unreasonably dangerous. KDI's response is essentially the same as its response to the negligence claim: the warning was adequate because the high school was knowledgeable on the topic and the danger of injury was open and obvious.

¶ 34. KDI appears to assume that the "sophisticated consumer" doctrine applies in a strict product liability case, but it cites no Wisconsin cases addressing this issue. *Haase* was a negligence claim under RESTATEMENT (SECOND) OF TORTS § 388. 669 N.W.2d 737, ¶ 21. In *Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 676, 280 N.W.2d 226 (1979), *see supra* note 6, the inadequate warning issue was also addressed in the context of a negligence claim. While we have acknowledged the difficulty of distinguishing between a negligence claim and a strict product liability claim when both are based on an allegedly inadequate warning, *see supra* note 10, we are reluctant, without more guidance from the supreme court, to import doctrines from the former

---

due to an inadequate warning. Not surprisingly, although the parties here each properly recite the distinct standards for each claim, we are unable to tell from their arguments whether they believe there is a practical difference in the two claims in this case.

We believe litigants and courts would benefit from a clarification by the supreme court of the differences, if any, between the proof required for a negligence claim and for a strict product liability claim when the assertion underlying both claims is that the warning was inadequate.

into the latter. We will therefore analyze KDI's arguments within the framework of RESTATEMENT (SECOND) OF TORTS § 402A only.[11]

¶ 35. We conclude that whether KDI had a "reason to anticipate that danger may result from the particular use"—that is, the use of the platforms to perform racing starts in less than five feet of water—encompasses what KDI knew or should have known about how the ordinary high school that purchased the platforms would use them. The level of knowledge on safe water depths of ordinary high school purchasers is relevant to this inquiry. However, as we have explained in the context of the negligence claim, the evidence on this point is conflicting.

¶ 36. We also conclude that KDI's contention that the danger was open and obvious involves evidence relevant to the adequacy of the warning. If the danger of performing racing starts from the platforms in less than five feet of water is apparent to the ordinary high school purchaser, then KDI has reason to believe that high schools will place them accordingly and does not have reason to anticipate danger from placement in water that is too shallow. However, as we have already

_____

[11] We observe that on the topic of the adequacy of warnings, RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY (1998) appears to adhere to the same fundamental concept that a warning is required when a manufacturer has "reason to anticipate that danger may result from the particular use," but it is significantly more detailed. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(c) & cmts. j-m. However, because the supreme court in *Green*, 245 Wis. 2d 772, ¶ 74, declined to adopt RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY with respect to design, § 2(b), we are uncertain whether adopting § 2(c) on warnings would be consistent with *Green*. Accordingly, we do not adopt § 2(c).

explained, the evidence on whether this danger was apparent to the ordinary high school is conflicting.

¶ 37. As for the asserted obviousness of the danger as it relates to the question of Mohr's contributory negligence, contributory negligence may be a defense to a strict product liability claim. *Green*, 245 Wis. 2d 772, ¶ 59; *see also Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶ 24, 244 Wis. 2d 758, 628 N.W.2d 833 (explaining that the act to which the seller's responsibility attaches in a strict product liability case is not negligence but rather placing a defective product in the stream of commerce; therefore, when contributory negligence is an issue, the comparison is between the extent to which the plaintiff's injuries are attributable to his or her negligence and the extent to which they are attributable to the product's defective condition). For the reasons we have explained in our discussion on the negligence claim, there are disputed issues of fact concerning whether Mohr was contributorily negligent and, if so, to what degree.[12]

*Claim Against the WIAA*

¶ 38. Mohr contends there are disputed issues of fact both as to whether the WIAA was negligent in

---

[12] KDI also argues that as a matter of public policy it should not be held liable for Mohr's injuries. Mohr objects to our consideration of this issue because KDI did not raise it in the trial court. In any event, because we have concluded there are disputed issues of fact regarding both the negligence and strict product liability claims against KDI, a public policy determination should be made only after a full factual resolution of these claims. *See Alvarado v. Sersch*, 2003 WI 55, ¶ 20, 262 Wis. 2d 74, 662 N.W.2d 350; *see also infra* ¶¶ 47–48.

adopting Rule 2–7–2 and as to whether public policy precludes imposing liability on the WIAA even if it was negligent. The WIAA responds that the trial court correctly ruled that, as a matter of law, the WIAA had no duty to independently assess the adequacy of Rule 2–7–2 and, in any event, based on the undisputed facts it would be against public policy to impose liability on the WIAA for Mohr's injuries.

¶ 39. In Wisconsin, the rule is that every person has a duty to use ordinary care in all of his or her activities, and a person is negligent when that person fails to exercise ordinary care. *Alvarado v. Sersch*, 2003 WI 55, ¶ 14, 262 Wis. 2d 74, 662 N.W.2d 350. Under the general framework governing the duty of care:

> Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.

*Gritzner*, 235 Wis. 2d 781, ¶ 22 (quoting Wis JI—Civil 1005).

> [Thus] the particular conduct of a defendant is not examined in terms of whether or not there is a duty to do a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances.

*Id.*, ¶ 24.

¶ 40. The WIAA's argument that it had no duty as a matter of law overlooks the distinction between the issue of duty and the issue of liability. Although courts

have sometimes used the language that a defendant had "no duty" to the injured person, they are in reality making a decision that there should be no liability as a matter of public policy. *Id.*, ¶ 24 n.4. More recently, the court in *Alvarado* clarified the distinction:

> The question of duty is nothing more than an ingredient in the determination of negligence. Once it has been determined that a negligent act caused the harm, the question of duty is irrelevant and a finding of nonliability can be made only in terms of public policy.
>
> The "duty" ingredient of negligence should not be confused with public policy limitations on liability. The doctrine of public policy, not the doctrine of duty, limits the scope of the defendant's liability.

262 Wis. 2d 74, ¶¶ 15–16 (citations and footnote omitted).

¶ 41. Thus, the crucial question with regard to the WIAA's duty is not, as the WIAA frames it, whether it had a duty to make its own assessment of the adequacy of Rule 2–7–2 before adopting it, but, rather, whether its conduct in not doing so was consistent with its duty to exercise reasonable care. *See Gritzner*, 235 Wis. 2d 781, ¶ 25. With this formulation of duty in mind, we examine the evidence to determine whether there are disputed issues of fact.

¶ 42. The evidence and reasonable inferences from the evidence, viewed most favorably to Mohr, include the following. The WIAA executive director was aware that schools rely on the WIAA to have safe playing rules. The WIAA was not obligated to adopt the Federation's rules, and had in the past adopted a more restrictive rule with regard to the minimum depths for spring diving boards. The Federation rule provided for a nine-foot minimum, but, because of a change in the

335

way diving boards were manufactured, divers were able to go deeper than previously, and there was one or more instances of divers hitting the bottom of the pool. The WIAA asked the Federation Swimming and Diving Rules Committee to change the rule to require a ten-foot minimum, but that committee declined to change the Federation rule, so the WIAA adopted its own rule requiring a ten-foot minimum depth.

¶ 43.　With respect to Rule 2–7–2, the WIAA personnel knew that the Federation had changed the rule in 1991 because of injuries under the prior rule. The executive director of the WIAA knew that in 1994 the Federation considered a proposal to adopt a minimum depth of five feet, that two states had enacted legislation requiring five feet and another 4.5 feet, and that the Federation decided to conduct research on the topic. The WIAA did not make its own inquiries on the topic because the director decided to rely on the Federation's undertaking of the research. A Federation questionnaire asked the state associations whether it would recommend that schools move starting platforms to the deep end or to more than six feet deep, and 45% answered yes. Based on the research the Federation did, it decided there was no need to change Rule 2–7–2, and the WIAA therefore made no change in the rule.

¶ 44.　Mohr's expert opined that, prior to Mohr's injury, there were many well-publicized reports of catastrophic injuries to swimmers performing competitive racing starts in the shallow end of swimming pools, and these reports provided information to the WIAA, as well as to the Federation, that 3.5 feet of water was not a safe depth for competitive racing starts regardless of the platform height.

¶ 45.　We conclude that, if a jury chose to believe this evidence, it could reasonably decide that the WIAA

did not exercise reasonable care in adopting Rule 2–7–2 without making any inquiry into whether a competitive racing start in 3.5 feet of water was safe. There is, of course, evidence that would support the opposite determination, but we cannot conclude as a matter of law that the WIAA was not negligent. The cases the WIAA relies on for its argument to the contrary are so factually different that they offer no support for its argument. *See, e.g., McNeese v. Pier*, 174 Wis. 2d 624, 631, 497 N.W.2d 124 (1993) (no evidence to support jury determination that family acquaintance breached her duty of care by waiting in her car parked across the street from the child's home to take the child to school; child injured while crossing street to get to the car).

¶ 46. We next consider whether the WIAA is entitled to summary judgment on public policy grounds. The public policy considerations that a court applies to decide if it should preclude liability are:

> (1) the injury is too remote from the negligence; (2) the injury is too wholly out of proportion to the tortfeasor's culpability; (3) in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm; (4) allowing recovery would place too unreasonable a burden on the tortfeasor; (5) allowing recovery would be too likely to open the way for fraudulent claims; [or] (6) allowing recovery would enter a field that has no sensible or just stopping point.

*Alvarado*, 262 Wis. 2d 74, ¶ 17.

¶ 47. As the court in *Alvarado* has recently reaffirmed, in most cases the better practice is for the court to submit the case to the jury before determining whether public policy considerations preclude liability.

337

*Id.*, ¶ 18. Only in those cases where the facts are simple to ascertain and the public policy questions have been fully presented may a court review public policy and preclude liability before trial. *Id.* The court in *Alvarado* explained that a jury's determination of negligence includes an examination of whether the defendant's exercise of care foreseeably created an unreasonable risk of harm to others, and public policy factors can also implicate the concept of foreseeability. *Id.*, ¶ 19. Thus, evidence regarding foreseeability may play a dual role. *Id.* Besides having the aid of the jury's opinion when assessing liability, a judge will be aided by the facts brought to light during the jury trial. *Id.*

¶ 48. We are satisfied this is not one of those simple cases where a public policy determination can be made before trial. Whether the WIAA exercised reasonable care in adopting Rule 2–7–2 without making its own inquiry depends in part on what information was available to it on safe water depths for competitive racing starts and how readily available that information was to the WIAA, given the size of the WIAA staff and its resources. These are factual disputes that cannot be resolved on summary judgment, and their resolution is relevant to the application of the first four policy considerations, which appear to be the most relevant of the six.

¶ 49. We therefore conclude the trial court erred in granting summary judgment to the WIAA on the ground of public policy as well as on the ground that it was not negligent as a matter of law.

*By the Court.*—Order reversed and remanded.