Elizabeth MICHAELS, Individually and as Special Administrator of the Estate of Travis J. Michaels, Deceased, Plaintiff,

v.

MR. HEATER, INC., Admiral Indemnity Co., and Westchester Fire Insurance Company, Defendants.

No. 05–C–0369–C.

United States District Court, W.D. Wisconsin.

Jan. 30, 2006.

Erik T. Salveson, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, for Plaintiff.

Richard J. Nygaard, Rider Bennett, David M. Dahlmeier, Foley & Mansfield, P.L.L.P., Minneapolis, MN, Brett L. Warning, Bollinger, Ruberry & Garvey, Chicago, IL, V. Thomas Fryman, Jr., Greenebaum Doll & McDonald PLLC, Lexington, KY, Mark J. Gherty, Gherty & Gherty, S.C., Hudson, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Elizabeth Michaels, proceeding on her own behalf and on behalf of the estate of her late husband, Travis Michaels, brings claims of strict liability, negligence and wrongful death against defendant Mr. Heater, Inc. for its design, manufacture

and distribution of an allegedly defective portable propane gas heater. Jurisdiction is present under 28 U.S.C. § 1332.

On the afternoon of March 4, 2002, Daniel Michaels, owner of a business specializing in the delivery of water products, approached his son, Travis, and asked him to deliver bottled water to customers the following morning. Travis agreed to deliver the water, which was stored in the back of Daniel's truck. To prevent the water from freezing, Daniel had installed a propane heater, manufactured by defendant Mr. Heater, in the back of his vehicle. Daniel lit the heater on March 4, 2002, and left it in operation overnight. On the morning of March 5, 2002, Travis left his house and went to the truck. When he returned to his house shortly thereafter, his jacket was on fire. He was hospitalized for burns; five days later, he died. Plaintiff contends that Travis's injuries and death were the result of a malfunction in the heater, which caused propane gas to accumulate in the truck and explode.

On March 10, 2003, plaintiff commenced this lawsuit in the Circuit Court for St. Croix County, Wisconsin. On July 2, 2003, the case was removed to this court, but was remanded on June 3, 2004, when the addition of former defendants Daniel Michaels and Rural Mutual Insurance Company defeated diversity jurisdiction. On June 23, 2005, after plaintiff settled her claims against those defendants, the case was once again removed.

The case is now before the court on defendant Mr. Heater's motion for summary judgment, in which defendants Admiralty Indemnity Company and Westchester Fire Insurance Company have joined. In her brief in response to defendants' motion, plaintiff contends that this court should refrain from ruling on the motion because a similar motion for summary judgment was denied by the St. Croix County court. She relies on the "law of the case" doctrine, under which "as a general rule, courts should not reconsider issues which have already been decided in an action." *Federal Deposit Ins. Corp. v. First Mortgage Investors,* 485 F.Supp. 445, 450 (E.D.Wis.1980) (citing *Messenger v. Anderson,* 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)). The "law of the case" doctrine is prudential only and does not limit the power of a court to hear matters that may have been decided, in part or in whole, at an earlier stage in a lawsuit. *Messinger,* 225 U.S. at 444, 32 S.Ct. 739 (phrase "law of the case" "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power"). Where good reasons exist, prior rulings can be reevaluated taking into account changed circumstances. *Id.* In this case, the motion for summary judgment filed by defendants in state court covered some, but not all, of the issues defendants have raised in their present motion. In the end, plaintiff's objection is academic. Plaintiff has produced sufficient evidence from which a jury could find defendants liable on each of her theories of tort liability.

## ADMISSIBILITY OF EXPERT TESTIMONY

As required by this court's procedures on motions for summary judgment, defendants' motion for summary judgment was accompanied by proposed findings of fact. Plaintiff responded to these proposed findings, placing some facts into dispute by citing to the testimony of her experts witnesses. Defendants replied by challenging the admissibility of the testimony of plaintiff's experts. In defendants' reply brief, they challenge also the admissibility of the testimony of plaintiff's experts David Sand and Richard Cox. Because arguments raised for the first time in a reply brief are waived, *James v. Sheahan,* 137 F.3d 1003, 1008 (7th Cir.1998); *United States v. Spae-*

*ni*, 60 F.3d 313, 317 (7th Cir.1995); *United States v. Berkowitz*, 927 F.2d 1376, 1391 (7th Cir.1991), I have not considered challenges to Sand and Cox in deciding defendants' motion. However, defendants have raised a timely challenge against the admissibility of testimony of three of plaintiff's experts: Marvin Salzenstein, Tarald Kvalseth and Dr. Maureen Lowe. Therefore, before determining the undisputed facts of this case, I must address whether the testimony of Salzenstein, Kvalseth and Lowe is admissible.

In a diversity case, state law governs substantive claims, while federal law governs all procedural and evidentiary issues, including the admissibility of expert testimony. *Klonowski v. International Armament Corp.*, 17 F.3d 992, 995 (7th Cir. 1994). The question, then, is whether the testimony of Salzenstein, Kvalseth and Lowe meets the requirements of Fed. R.Evid. 702, which governs the admissibility of expert opinions in federal court. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Defendants contend that Salzenstein, Kvalseth and Lowe employed unreliable methods in arriving at their opinions in this case and are not qualified experts. From my review of the parties' proposed findings of fact and the depositions and reports of these experts, I conclude that Salzenstein, Kvalseth and Lowe are qualified to testify to the opinions they have rendered in this case. Although defendants' challenges to these experts' qualifications are fodder for cross-examination at trial, they do not demonstrate that the opinions fail to meet the requirements of Fed.R.Evid. 702.

### A. *Marvin Salzenstein*

■ Marvin Salzenstein is a registered professional engineer, who holds a bachelor of science degree from the Illinois Institute of Technology. He has completed postgraduate course work at several universities. In addition, Salzenstein is a member of numerous professional organizations, including the American Society of Mechanical Engineers, the American National Standards Institute, the American Society of Safety Engineers, the National Safety Council and the Systems Safety Society. He has worked on hundreds of "propane matters," including a dozen or more cases involving portable heaters. (None of these portable heater cases involved propane gas leaks, however.)

Before rendering an opinion in this case, Salzenstein reviewed abstracts of other witnesses' deposition testimony and the reports and affidavits of other experts. He examined the valve from the heater involved in this case and observed photographs of the heater. In addition, he performed testing on the valve. In support of his conclusion that the valve was not properly secured, he relied on standards issued by the American National Standards Institute.

Defendants challenge Salzenstein's testimony in two ways. First, they contend that his testimony would not be helpful to a jury because (a) he was unable to identify an alternative valve that would fit into defendant's heater and (b) he has no evidence that propane gas passing through the regulator of a Copreci valve could discharge the safety valve. Second, they con-

tend that Salzenstein's opinions "are not based on sufficient facts" because he relies upon voluntary industry standards as the basis for his opinion that the valve in question should have been constructed differently.

The facts show that Salzenstein observed the allegedly defective valve and performed testing on it. Defendants have not challenged the methods he used in the testing process. Moreover, despite defendants' assertions, Salzenstein *did* identify an alternative, safer valve that could have been used in defendant Mr. Heater's product. Although Salzenstein acknowledged that the recommended valve is not currently manufactured in dimensions that would fit the propane heater, he asserts that defendant Mr. Heater could have had the valve tailored to fit the dimensions of its product. It is true that Salzenstein has not shown that gas flowing through the Copreci valve dislodged the gasket; however, he has conducted tests demonstrating that the gasket can be displaced easily, with little force, creating a risk of gas leaks and combustion. Finally, Salzenstein's testimony regarding defendant Mr. Heater's failure to comply with voluntary industry standards is admissible, although certainly not conclusive evidence of negligence. *See, e.g., Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d 312, 326 (1st Cir.2004) (Although "voluntary standards do not irrefutably establish the standard of care in a negligence case . . . they constitute one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of the case.") Because his testimony is competent and could assist a jury in understanding the alleged defect in defendant Mr. Heater's product, Salzenstein's testimony is admissible under Fed.R.Evid. 702.

## B. *Maureen Lowe*

Dr. Maureen Lowe is Director of Anatomic Pathology at Regions Hospital in St. Paul, Minnesota. She is an anatomic and clinical pathologist; she is not a forensic pathologist. Lowe is certified by the American Board of Pathology and is trained in anatomic, clinical and autopsy pathology. She graduated from the University of Minnesota Medical School in 1990 and has worked as an attending pathologist at the Hennepin County Medical Center, as an instructor at the University of Minnesota, as a pathologist and medical director of St. James Mercy Hospital in Hornell, New York and as an assistant professor and attending pathologist at the University of Rochester Medical Center.

On March 12, 2002, Lowe conducted an autopsy of Travis Michaels using standard autopsy protocol. As part of the autopsy, she reviewed Travis's medical records, examined his body, weighed and measured his major organs and arranged for a toxicology evaluation. She found discoloration of Travis's trachea and bronchi, missing mucosa lining and inflamed submucosa, which suggested to her that Travis had sustained thermal burns in his airway. In addition, she found hemorrhaging in his pancreas, petechial findings, fat necrosis and changes in lung tissue. (According to the *American Heritage Dictionary* (4th ed.2000), petechiae are "small purplish spots on a body surface, such as skin or mucous membrane.") Lowe believes that damage to Travis's myocardium, arrythmias, tubular necrosis and "leaky lungs" all suggest organ failure caused by pancreatitis.

After completing the autopsy, Lowe concluded that Travis's death had been caused by "pulmonary edema complicated by aspiration and pancreatitis secondary to thermal burns." She listed "respiratory failure" as the cause of death on her autopsy

report. In a letter dated September 26, 2002, Lowe stated, "It is my professional opinion that the primary findings at autopsy are secondary to thermal burns and that the thermal burns are more likely than not the cause of Mr. Michael's death."

At Regions Hospital, when a patient dies suddenly and no cause of death is identified, it is hospital practice to send the patient's heart to a cardiac pathologist for examination. Lowe identified a cause of death for Travis Michaels and did not note any histologic change in his heart that suggested to her that a heart problem contributed to his death; therefore, she did not send his heart to a cardiac pathologist.

After his accident, Travis was taken to a Wisconsin hospital before he was transferred to Regions Hospital. An electrocardiogram performed at the Wisconsin hospital revealed an abnormality. Dr. Lowe did not examine the electrocardiogram in conjunction with Travis's autopsy. She viewed the test for the first time at her deposition on June 2, 2005. At that time, she stated that she "was not an expert at reading electrocardiograms" and could not tell whether Travis's test result was normal. However, she testified that even if she had known about the abnormal test result, she would not have sent Travis's heart to a cardiac pathologist for further testing because she had identified the cause of his death.

Defendants allege that Lowe's deposition testimony is contradictory and contains an admission that she failed to follow hospital protocol by not sending Travis's heart to a cardiac pathologist for examination. A review of the cited testimony reveals no such contradictions or admissions. Furthermore, even if Lowe's testimony did revealed flaws in her autopsy procedures, those errors would be relevant to her credibility, not to the admissibility of her testimony. Lowe is a highly experi-enced pathologist, trained and practiced in conducting autopsies. She personally performed Travis's autopsy according to standard procedures. Her testimony is admissible.

### C. Tarald Kvalseth

■ Dr. Tarald Kvalseth is a "human factors" expert, with thirty-five years' experience in his field. He holds a bachelor of science degree in mechanical engineering from King's College in Newcastle, England, a master of science degree in industrial engineering from the University of California at Berkeley and a doctor of philosophy degree in industrial engineering and operations research from the University of California at Berkeley. He has been a research fellow, lecturer and professor at numerous universities. From 1982–1985, Kvalseth was a professor of mechanical engineering, industrial engineering and biomedical engineering at the University of Minnesota, where he is now an emeritus professor. He has published several books and more than 100 papers and technical research projects and is a member of the Ergonomics Society, Human Factors and Ergonomics Society, Institute of Industrial Engineers and Institute of Electrical and Electronics Engineers.

Kvalseth has served as an expert witness in a number of other cases, including cases in which he has offered opinions on the adequacy of warnings placed on portable heaters. He has read numerous articles and textbooks about warnings.

In rendering his opinion in this case, Kvalseth reviewed deposition transcripts, expert reports and affidavits, examined the thermocouple and valve from the allegedly defective heater and observed photographs of the heater. In addition, Kvalseth reviewed the instructions and warnings contained on the heater or packaged with it when it was sold, and warning and instruc-

tions found on the packaging that accompanied replacement thermocouples.

Kvalseth has "no criticism" of the content of the warning contained on defendant Mr. Heater's product. However, he objects to defendant Mr. Heater's decision to place its product warnings on a tag attached to the heater's replaceable thermocouple. According to Kvalseth, the warning tag should have been permanently affixed to the product, not attached to a replaceable part. Furthermore, because the warning was attached to a replaceable part, it is Kvalseth's opinion that all replacement thermocouples should have included warning tags or, at the very least, pictures of the warning tag should have been featured on instructions accompanying the replacement parts.

In his deposition testimony, Kvalseth supported his opinions with an industry standards in place at the time the product was manufactured (standard 1.15.3) and with standards issued in 1991 (ANSI Z535.4) and 2000 (ANSI Z21.63). Because the content of standard 1.15.3 is not contained in the parties' proposed findings of fact, Kvalseth's expert report or his deposition testimony, it is impossible to know what that standard requires. Drawing all inferences in plaintiff's favor, it appears from plaintiff's brief and from Kvalseth's deposition testimony that standard 1.15.3 may have required a warning tag to be "permanently affixed" to the product about which it warns. Kvalseth contends that the 1991 and 2000 standards on which he relies clarify what it means for a warning to be "permanently affixed" and indicate that a tag attached to a replacement part is not permanently affixed to the product.

Under the analysis set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a district court must "ensure that any and all scientific testimony or evidence admitted [at trial] is not only relevant, but reliable." In determining what testimony is reliable and what is not, the court is to consider whether the scientific theory can be and has been tested; whether the theory has been subjected to peer review and publication; the theory's known or potential rate of error when applied; and whether the theory has been "generally accepted" in the scientific community. *Id.* at 593–94, 113 S.Ct. 2786. This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir.2005).

Human factors analysis is not novel. "It is a recognized analytical approach that is applied in a variety of contexts and may yield legitimate insights as to the hazards that particular products and situations ... may pose in light of predictable human behavioral patterns." *Mihailovich v. Laatsch*, 359 F.3d 892, 919 (7th Cir.2004). A human factors analysis focuses on the interaction between human behavior and the design of a machine or product. *Id.* at 915. An expert engaging in such an analysis will consider whether, in light of predictable human behavior, the design or condition of the subject item poses a potential hazard. *Id.*

It is undisputed that Kvalseth is an expert is human factors engineering. Although he performed no studies or tests in conjunction with this case, the theories and methods upon which he relies are recognized by the engineering community. Kvalseth's credentials are impressive, and his knowledge of warnings and their prop-

er design may be helpful to the jury. Therefore, his testimony is admissible.

I now turn to the notice of removal and the parties' proposed findings of fact, from which I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Elizabeth Michaels is the widow of Travis Michaels and the special administrator of his estate. She is a citizen of Wisconsin, as was Travis Michaels before his death.

Defendant Mr. Heater is incorporated under New Jersey law, with its principal place of business in Ohio. Defendant Admiral Indemnity, Co. is incorporated under New Jersey law, with its principal place of business in New Jersey. Defendant Westchester Fire Insurance Company is incorporated under New York law, with its principal place of business in Georgia.

### B. *The Accident*

In late 2001, Travis Michaels, his wife, plaintiff Elizabeth Michaels, and their young child moved from Minnesota to property in Grantsburg, Wisconsin owned by Travis's father, Daniel Michaels. Daniel is the owner of Aquaman, a business that sells and services water softeners, water treatment products and bottled water for water coolers. On March 4, 2002, Daniel drove his delivery truck to Lindstrom, Minnesota to picked up a shipment of bottled water from his supplier. He loaded the bottles onto racks installed in the back of his truck. Attached to one of the racks was a propane heater manufactured in 1990 by defendant Mr. Heater. Daniel sometimes used the heater to prevent bottled water from freezing on cold days. Before Daniel left the loading dock in Lindstrom, he lit the heater.

When he arrived back at his property in Grantsburg, Daniel left the heater running and arranged for Travis to deliver the bottled water the following morning. Daniel does not remember whether he told Travis to check the heater before leaving to deliver the water.

The next morning, before leaving the farmhouse, Travis told Elizabeth he was going to check on the water in the truck. Shortly thereafter, Travis's jacket caught fire, the heater exploded and Travis was seriously injured. He was taken to a local hospital and then transferred to Regions Hospital in St. Paul, Minnesota, where he was treated by Dr. William Mohr. Five days later, on March 10, 2002, Travis died unexpectedly.

### C. *The Heater*

#### 1. *The safety valve*

The heater owned by Daniels Michaels was manufactured in 1990 by defendant Mr. Heater. When designing the heater, defendant Mr. Heater decided to use a safety valve manufactured by former defendant Copreci. Defendant Mr. Heater provided Copreci with specifications Copreci was to use when manufacturing the valve.

After Travis's accident, several experts examined and tested the heater. Engineer Richard Cox concluded that after the heater's flame extinguished, a safety valve failed to close off the flow of propane gas because a rubber gasket had fallen off the valve. According to Cox, the accumulated propane gas then ignited, starting the fire that burned Travis. It is Cox's opinion that the allegedly faulty valve made the heater defective and unreasonably dangerous.

David Sand is a mechanical engineer. After examining the heater involved in this case, he stated, "Had the heater been functioning properly, no propane gas would have been released from the heater head. The release of propane in an unlit state is

indicative of a malfunction of the thermocouple safety mechanism." Sand believes that the faulty thermocouple safety mechanism failed, allowing combustible gas to accumulate in the truck's cargo compartment, causing the explosion and fire.

In 1990, defendant Mr. Heater received at least two customer complaints concerning valve leaks in its portable propane heater. On September 11, 1991, the Copreci Corporation notified defendant Mr. Heater in writing about valve leaks it had discovered during product testing. Defendant Mr. Heater has been sued twice prior to this lawsuit for the alleged malfunction of safety valves on heaters of the same model as the heater involved in this case.

2. *The warning tag*

The heater owned by Daniel Michaels came equipped with a warning tag attached to the heater's thermocouple. The thermocouple on the heater had to be replaced periodically. Defendant knew that when a new thermocouple was installed, the heater's warning tag was likely to be removed. Some time before March 4, 2002, Daniel replaced the thermocouple on his heater, which required him to remove the tube to which the metal warning tag was attached. At the time of Travis's accident, there was no warning tag on the heater.

The heater came with an instruction manual. The manual warned users to operate the heater only in well-ventilated areas, never to leave the heater unattended and never to leave the heater in operation while the user was sleeping. Daniel Michaels left the heater unattended and in operation while he slept on the night of March 4, 2002.

Engineer Marvin Salzenstein believes that the heater was defective and unreasonably dangerous and that its defect caused the fire that burned Travis. According to Salzenstein, the freezing weather conditions on the night of March 4, 2002, may have caused the heater's safety valve to dislodge, permitting the flow of propane gas into the truck. Defendant knew its product would be used in below-freezing temperatures, but did not warn consumers of any possible danger associated with using the heater in below-freezing temperatures.

OPINION

Plaintiff has asserted three causes of action against defendants: strict liability, negligence and wrongful death. Because "tort actions generally encompass a multitude of factual issues and abstract concepts that become elusive when applied to varying concrete factual situations, [they] are usually not appropriate for disposition by summary judgment." *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1316 (7th Cir.1983); *Adelman–Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 518 (7th Cir.1988) (recognizing that "tort actions generally are not disposed of by summary judgment because they typically involve a myriad of factual issues."). This case proves no exception to the general rule.

A. *Effect of Settlement with Former Defendant Copreci*

As a preliminary matter, defendants contend that plaintiff is barred from asserting her strict liability and negligence claims against them because she has settled her claim against former defendant Copreci, manufacturer of the allegedly faulty valve. Defendant has cited no law in support of this argument and independent research has revealed none.

■■ Under Wisconsin law, if a plaintiff succeeds in proving each element of strict liability, "all sellers in the chain of distribution—manufacturer, distributor, retailer—are strictly liable to the plaintiff, although they may have contribution

rights against each other." *Fuchsgruber v. Custom Accessories, Inc.,* 2001 WI 81, ¶ 15, 244 Wis.2d 758, 628 N.W.2d 833 (Wis. 2001). When determining fault in strict product liability cases, "the jury is asked to apportion the extent to which the plaintiff's injuries were attributable to his own contributory negligence as compared to the product's defectiveness." *Id.,* ¶ 20 (citing Wis. JI–Civil 3290). That is, the initial comparison is plaintiff-against-product, not plaintiff-against-defendants. *Id.* The jury is asked a separate question regarding the apportionment of liability for contribution among the various defendants responsible for placing the defective product in the stream of commerce. *Id.* Because settlement with one tortfeasor does not decrease the percentage of contribution owed to a plaintiff by the remaining tortfeasors, settlement with one defendant does not bar recovery against other defendants. *See, e.g., Peiffer v. Allstate Ins. Co.,* 51 Wis.2d 329, 335–36, 187 N.W.2d 182, 185 (1971); *Pierringer v. Hoger,* 21 Wis.2d 182, 191–92, 124 N.W.2d 106, 111–12 (1963). Therefore, plaintiff's settlement with Copreci does not affect her strict liability claims against defendants.

Similarly, plaintiff's negligence claims are not barred by her settlement with former defendant Copreci. Joint and several liability among multiple tortfeasors has long been a common-law rule in Wisconsin. *Matthies v. Positive Safety Mfg. Co.,* 2001 WI 82, ¶ 11, 244 Wis.2d 720, 628 N.W.2d 842. The fact that plaintiff has settled her claims against other alleged tortfeasors does not automatically exonerate defendants from liability. Under Wisconsin law, if defendants are found to have been "causally negligent," they may remain liable to plaintiff for damages, notwithstanding any set-off authorized by Wis. Stat. § 885.285(3) (directing court, upon proper request, to "reduce the amount of the damages so determined by the amount of the [settlement] payments made [to the plaintiff].")

## B. *Strict Liability Claim*

■ To establish a strict liability claim, a plaintiff must prove that: (1) the product was in defective condition when it left the possession or control of the seller; (2) it was unreasonably dangerous to the user or consumer; (3) the defect was a cause of the plaintiff's injuries or damages; (4) the seller engaged in the business of selling the product; and (5) the product was one that reached the user or consumer without substantial change in the condition in which it was sold. *Haase v. Badger Mining Corp.,* 274 Wis.2d 143, 154–155, 682 N.W.2d 389, 395 (2004). The parties agree that defendant Mr. Heater was engaged in the business of selling propane heaters. They dispute whether the heater was defective and unreasonably dangerous, whether its alleged malfunction caused Travis Michael's injuries and death and whether, through the removal of the heater's warning tag, the condition of the heater had been changed substantially by the time Travis Michaels encountered it. Plaintiff's experts have identified two features of the heater that they contend rendered defendant Mr. Heater's product unreasonably dangerous: the safety valve was prone to breakage and the heater lacked adequate warnings.

### 1. *Safety valve design*

■ First, plaintiff contends that the heater's safety valve was easily broken, rendering it defective and unreasonably dangerous. "Although determining whether a product is defective and whether a product is unreasonably dangerous are two separate inquiries, as a practical matter courts usually address them together." *Tanner v. Shoupe,* 228 Wis.2d 357, 366, 596 N.W.2d 805, 812 (Ct.App.1999). Under Wisconsin law, a product is defective when

"it is in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." *Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, ¶ 29, 245 Wis.2d 772, 629 N.W.2d 727; *Mohr v. St. Paul Fire & Marine Ins. Co.*, 2004 WI App 5, ¶ 31, 269 Wis.2d 302, 674 N.W.2d 576. A product is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* at 16, 269 Wis.2d 302, 674 N.W.2d 576.

▆▆▆ Whether a product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer. *Green*, 2001 WI 109, ¶ 29, 245 Wis.2d 772, 629 N.W.2d 727 (citing *Vincer v. Esther Williams All–Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 332, 230 N.W.2d 794, 798 (1975)). If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, the product will not be considered unreasonably dangerous and defective. *Id.* The question whether a product is unreasonably dangerous is an objective test and is not dependent upon the knowledge of the particular injured consumer. *Id.* In Wisconsin, strict products liability "applies although . . . the seller has exercised all possible care in the preparation and sale of his product." *Id.*, ¶ 56, 629 N.W.2d 727 (citing Restatement (2d) of Torts 402A(2)(a) (1965)). Thus, regardless whether manufacturers foresee potential risks of harm inherent in their defective and unreasonably dangerous products, strict liability will hold manufacturers responsible for injuries caused by their products. *Id.*

Plaintiff's experts contend that the Copreci valve used by defendant Mr. Heater was prone to breaking, thereby creating a risk of gas leaks. Plaintiff's experts contend that alleged defects in the valve rendered the heater unreasonably dangerous. Although defendants disagree with the conclusions of plaintiff's experts, they have offered no evidence to contradict the experts' opinions. They do not dispute that the valve was prone to breaking or that an alternative valve could have been manufactured in dimensions that would have fit defendant Mr. Heater's product. Instead, defendants' argument seems to be that the wrongdoing of former defendants Copreci and Daniel Michaels and Travis Michaels's own negligence overshadow any responsibility they may have for the damages resulting from Travis's accident.

▆▆▆ Under Wisconsin law, strict liability is not absolute liability. *Fuchsgruber*, 2001 WI 81, ¶ 18, 244 Wis.2d 758, 628 N.W.2d 833. The defense of comparative negligence is available to defendants, which is why the first question a jury must answer is "the extent to which the plaintiff's injuries were attributable to his own contributory negligence as compared to the product's defectiveness." *Id.*, ¶ 20 at 771, 628 N.W.2d 833. Whether Travis Michaels bore more responsibility for his accident than defendants did is a disputed question of fact for the jury to resolve at trial. Therefore, defendants' motion for summary judgment must be denied with respect to plaintiff's claim that a defect in the heater's safety valve rendered the product unreasonably dangerous.

## 2. *Adequacy of warnings*

### a. Unreasonable danger

Plaintiff contends that the heater was also unreasonably dangerous because it lacked adequately placed warnings explaining the danger of potential gas leakage. Although foreseeability is generally not an issue in strict liability claims, Wisconsin law contains an exception for claims premised upon inadequate warnings. Wis-

consin permits plaintiffs to bring both strict liability and negligence claims premised upon the inadequacy of a product's warnings. However, Wisconsin has not distinguished between the liability standards that govern each type of claim. *See, e.g., Mohr,* 2004 WI App 5, ¶ 32 n. 10, 269 Wis.2d 302, 674 N.W.2d 576 ("This court has stated that the proof requirements for an inadequate warning on a strict product liability claim are the same as for breach of the duty to warn on a negligence claim."); *Gracyalny,* 723 F.2d at 1318; *Tanner,* 228 Wis.2d at 365, n. 3, 596 N.W.2d 805. Because Wisconsin courts analyze "failure to warn" claims identically, regardless of the legal theory under which they are pled, I will do the same.

The failure to provide adequate warnings concerning a product can constitute a defect rendering the product unreasonably dangerous; however, a manufacturer can be held strictly liable only when it has failed to warn of dangers of which it knew or should have known. *Gracyalny,* 723 F.2d at 1317 (applying Wisconsin law). In other words, if a product is designed and manufactured to be as safe as possible, but still contains a hidden danger, the manufacturer has a duty to warn the consumer of the hidden danger. *Tanner,* 228 Wis.2d at 367–368, 596 N.W.2d 805. A manufacturer must anticipate the environment is which its product will normally be used and provide a warning that is adequate and appropriate under those circumstances. *Id.* The duty to warn arises when the manufacturer has, or should have knowledge of a dangerous use of its product. *Krueger v. Tappan Co.,* 104 Wis.2d 199, 207, 311 N.W.2d 219, 223 (1981). However, if a danger is "open and obvious," a manufacturer may plead the obviousness of the danger as an affirmative defense, which the jury may consider in apportioning comparative fault. *Strasser v. Transtech Mobile Fleet Service, Inc.,*

2000 WI 87, ¶ 60, 236 Wis.2d 435, 613 N.W.2d 142.

In general, the adequacy of a warning is a question for the jury. *Schuh v. Fox River Tractor Co.,* 63 Wis.2d 728, 739, 218 N.W.2d 279, 285 (1974). In deciding whether a warning is sufficient to apprise the user of the particular hazard, the jury is to consider all pertinent factors, such as the likelihood of a particular accident taking place and the seriousness of the consequences. *Id.; Tanner,* 228 Wis.2d at 368, 596 N.W.2d at 812.

It is undisputed that defendant Mr. Heater had received reports of gas valve leaks from customers on at least two occasions in 1990 and was sued previously for malfunctions in the safety valve used in its heater. In addition, although it is undisputed that the heater originally contained a warning instructing users not to light the heater if they smelled gas, this warning was affixed to a part of the heater that needed periodic replacement. Replacement parts did not contain new warning tags. The parties dispute whether the method by which the warnings were affixed to the heater rendered the product defective and unreasonably dangerous.

This parties' dispute over the adequacy of the heater's warnings will preclude summary judgment only if plaintiff has offered proof from which a jury could reasonably find all remaining elements of strict liability: injury and causation. Therefore, the next question is whether plaintiff has raised a material question regarding whether the heater's alleged defect caused the injuries for which she is seeking compensation.

b. Causation

Defendants contend that even if plaintiff can prove that defendant was aware of a danger and failed to adequately warn

against it, she cannot prevail on her claim because she is unable to show that defendants' failure to provide adequate warnings caused the injuries for which she seeks relief. The Court of Appeals for the Seventh Circuit has held that in a diversity case, a federal court must apply the applicable state's law as enunciated by the highest state court or otherwise by the intermediate appellate courts of the state. *Kutsugeras v. AVCO Corp.*, 973 F.2d 1341, 1346 (7th Cir.1992); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Wisconsin Supreme Court has not addressed what a plaintiff must do to show causation when she claims that a defendant has breached its duty to warn. Wisconsin appellate courts have addressed the matter, but with differing results.

In support of their proposition that causation cannot be presumed in a "failure to warn" case, defendants cite the decision of the Wisconsin Court of Appeals in *Kurer v. Parke, Davis & Co.*, 2004 WI App 74, ¶ 25, 272 Wis.2d 390, 679 N.W.2d 867. In *Kurer*, the court considered whether a drug manufacturer could be found negligent for failure to warn of a rare medication side effect. The plaintiff in *Kurer* alleged that she had developed a rare disease as a result of taking prescription birth control pills. *Id.*, ¶ 8, 679 N.W.2d 867. Her symptoms included bothersome headaches, ringing in her ears and a rash. *Id.*, ¶ 26, 679 N.W.2d 867. Warnings included with her medication directed her to call a doctor if she experienced headaches; however, she did not seek medical attention for many months, at which time she was hospitalized with severe and permanent injuries. *Id.*, ¶¶ 6, 8, 679 N.W.2d 867.

Citing decisions issued by foreign courts, the Wisconsin court concluded that "even when a warning is inadequate, proximate cause is not presumed." *Id.* (citing *Mazur v. Merck & Co., Inc.*, 742 F.Supp.

239, 262 (E.D.Pa.1990) and *Staymates v. ITT Holub Indus.*, 364 Pa.Super. 37, 527 A.2d 140, 147 (1987)). The court went on to state that unless a plaintiff offers evidence that an injured party "would have altered his behavior and avoided injury," the plaintiff cannot establish that defendant's failure to warn was the "proximate cause" of the injuries for which she seeks compensation. *Id.* Defendant contends that plaintiff's failure to warn claim is barred under *Kurer*, because she has not produced evidence showing that a different warning on the propane heater would have prevented Travis's injury.

Plaintiff responds by citing the decision of the Wisconsin Court of Appeals in *Tanner*, 228 Wis.2d at 368, 596 N.W.2d at 812. She asserts that, under *Tanner*, she is entitled to a "presumption of causation" on her failure to warn claims. In *Tanner*, the court considered whether a plaintiff could proceed on a claim of strict liability for failure to warn when he admitted that he had not read the warnings contained on an allegedly defective car battery and had failed to take the cautionary steps directed by the warnings. *Id.* at 362; 596 N.W.2d at 810. The court began its analysis by summarizing the standard for causation under Wisconsin law:

> The standard for causation in strict products liability cases is whether the defect was a substantial factor in producing the injury. It need not be the sole factor or the primary factor, only a "substantial factor." The phrase "substantial factor" denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense. There may be several substantial factors contributing to the same result.

*Id.* at 368, 596 N.W.2d 805 The court reasoned that if a jury found that the defendant's product had caused Tanner's injuries, "it could also reasonably determine that Tanner's injuries could have been prevented if [the missing warnings had been heeded]." *Id.* at 379, 596 N.W.2d 805. Citing the Restatement (Second) of Torts, the court held:

> If the battery had contained a warning against pounding on the vent caps, a fact-finder could "reasonably assume that it would have been read and heeded." ... See Restatement (Second) of Torts § 402A cmt. j (1965). Therefore, a reasonable jury could determine that the lack of such a warning was a substantial factor in causing Tanner's injuries. *See Ortho Pharmaceutical Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541, 555 (1979) ("Where warnings are inadequate ... the presumption that they would have been read and heeded is in essence a presumption of causation.").

*Id.* at 379–80, 596 N.W.2d 805; *see also* Mark Geistfeld, *Inadequate Product Warnings and Causation,* 30 U. Mich. J.L. Reform 309 (Spring 1997) (discussing "heeding presumption"); Thomas H. Lee, Note, *A Purposeful Approach to Products Liability Warnings and Non–English–Speaking Consumers,* 47 Vand. L.Rev. 1107, 1115 n. 35 (1994) (stating that majority of courts presume that plaintiff would have read warning had it been provided). The Wisconsin court concluded that although Tanner had not read the warnings contained on the battery, "the adequacy of warnings is determined by reference to the effect on a reasonable person, regardless of whether the actual consumer read the warnings." *Id.* at 380–81, 596 N.W.2d 805 (internal citations omitted). Therefore, the court reversed the circuit court's entry of a directed verdict against Tanner on his failure to warn claim. *Id.* at 381, 596 N.W.2d 805.

I conclude that *Tanner* applies to this case, for several reasons. First, the reasoning of the court is more fully developed than the analysis provided in *Kurer*. *Tanner* grounded its decision in a logical extension of § 402A, cmt. j, of the *Restatement (Second) of Torts,* which has been cited approvingly in a number of Wisconsin cases. *See, e.g., Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, ¶ 83, 245 Wis.2d 772, 629 N.W.2d 727, Wis.2d 772, 245 Wis.2d 772, 629 N.W.2d 727; *Westphal v. E.I. du Pont de Nemours & Co., Inc.,* 192 Wis.2d 347, 363, 531 N.W.2d 386, 391 (Ct.App.1995); *Mohr,* 2004 WI App 5, ¶ 32, n. 10, 269 Wis.2d 302, 674 N.W.2d 576. The *Kurer* court focused its analysis on "proximate cause," a legal theory that Wisconsin no longer uses to discuss the causal connection between wrongdoing and injury. *Fandrey ex rel. Connell v. American Family Mut. Ins. Co.,* 2004 WI 62, ¶¶ 11–12, 272 Wis.2d 46, 680 N.W.2d 345 (holding that Wisconsin long ago "abandoned the use of the term 'proximate cause' to describe limitations on liability based on lack of causal connection in fact," replacing that analysis with "the 'substantial factor' test used to establish cause-in-fact, *which is a jury issue.*") (emphasis added). In contrast, in *Tanner,* the court emphasized the proper test under Wisconsin law: causation exists whenever the defendant's actions are a "substantial factor" in producing harm to the plaintiff.

Moreover, the facts of this case are more analogous to those confronted by the court in *Tanner* than in *Kurer*. The question in *Kurer* was whether the failure to include additional warnings was a cause of the plaintiff's injury when she disregarded specific statements in the warning directing her to seek medical attention for the symptoms she exhibited. Here, there is no evidence that Travis Michaels disregarded anything—because the heater as

he found it contained no warnings of any kind.

As in *Tanner*, the question in this case is whether a piece of equipment provided adequate warning to users of a danger of combustion. Tanner was permitted a presumption of causation even in the face of his admitted disregard for warnings found on the allegedly defective product. Travis Michaels did not disregard any warning and cannot provide testimony regarding whether he would have read warnings because he is deceased. Under these circumstances, I find it reasonable to permit plaintiff to proceed on her failure to warn claims. Although she still bears the ultimate burden of showing causation, the jury could find in her favor by making the permissible inference that Travis Michaels would have heeded any warnings placed on the heater.

### C. *Negligence Claims*

Negligence is ordinarily an issue for the fact-finder and not for summary judgment. *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 2, 241 Wis.2d 804, 623 N.W.2d 751. In order to grant summary judgment on a negligence claim, a court must be able to say "that no properly instructed, reasonable jury could find based on the facts presented that the defendant failed to exercise ordinary care." *Id.; Erickson v. Prudential Ins. Co.*, 166 Wis.2d 82, 93, 479 N.W.2d 552 (1991). Such scenarios are uncommon, though not nonexistent.

■■■ Plaintiff alleges that defendant Mr. Heater was negligent in two ways: by using a defective safety valve and by failing to provide adequate warnings. A negligence action requires proof of four elements: (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury. *Morden v. Continental AG*, 2000 WI 51, ¶ 45, 235 Wis.2d 325, 611 N.W.2d 659. Defen-

dants concede that defendant Mr. Heater owed a duty of care to users of its product and that it was obliged to foresee all reasonable uses of its product and the consequent foreseeable dangers associated with those uses, and to take precautions to avoid unreasonable risks of injury. *Kozlowski v. John E. Smith's Sons, Co.*, 87 Wis.2d 882, 896, 275 N.W.2d 915 (1979). Defendants contend that they did not breach any duty. They also contend (again) that even if they did breach a duty with respect to the warnings contained on the heater, the alleged breach did not cause injury because plaintiff cannot show a causal connection between defendants' alleged failure to warn and Travis Michaels's injuries.

■■■ As was the case with plaintiff's strict liability claim for failure to warn, plaintiff has presented evidence that raises a material dispute regarding whether defendant Mr. negligently failed to warn of a known danger associated with its product. If the jury finds that defendant Mr. Heater breached its duty to warn, the jury could reasonably determine that the failure to provide adequate warnings was a substantial factor in causing Travis's injuries. Therefore, defendants' motion for summary judgment will be denied with respect to plaintiff's negligence claim premised upon defendant Mr. Heater's failure to provide adequate warnings.

■■■ In addition, plaintiff has introduced evidence supporting her claim that Mr. Heater's use of the Copreci safety valve was negligent. Plaintiff's experts Cox, Sand and Salzenstein each contend that the valve selected by defendant Mr. Heater and made according to its specifications was prone to gas leaks. Moreover, Salzenstein has identified a safer alternative valve, in use at the time the product was manufactured, that could have been made to fit the propane heater. It is the

contention of plaintiff's experts that the heater malfunctioned, leaking propane gas and resulting in a combustion that caused Travis's burns. Plaintiff's expert, Dr. Lowe, has testified that those burns ultimately resulted in Travis's death. From these alleged facts, a jury could find negligence. Therefore because disputed material facts remain at issue, defendants' motion for summary judgment will be denied with respect to plaintiff's claim that the propane heater manufactured by defendant Mr. Heater was negligently designed.

### D. *Wrongful Death Claim*

 In addition to her strict liability and negligence claims, plaintiff has brought a claim for Travis's wrongful death under Wis. Stat. § 895.04, which provides that "an action for wrongful death may be brought by the personal representative of the deceased person or by the person to whom the amount recovered belongs." The purpose of the statute is "to compensate for loss of the relational interest existing between the beneficiaries and the deceased." *Petta v. ABC Ins. Co.*, 2005 WI 18, ¶ 16, 278 Wis.2d 251, 692 N.W.2d 639 (citing *Chang v. State Farm Mut. Auto. Ins. Co.*, 182 Wis.2d 549, 560–61, 514 N.W.2d 399 (1994)). To that end, § 895.04(4) allows wrongful death plaintiffs to recover for pecuniary injury, as well as loss of society and companionship. *Id.*

Defendants contend that plaintiff's wrongful death claim is barred because she cannot show that Travis's burns caused his death. As discussed above, the long-standing test for cause in Wisconsin is whether a product's alleged defect was a substantial factor in producing the injury for which damages are being sought. *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.*, 121 Wis.2d 338, 357–58, 360 N.W.2d 2, 11 (1984). Defendants' medical experts contend that Travis's death was unrelated to the injuries he sustained on March 5, 2002. Plaintiff's expert, Dr. Lowe, dis-

agrees and contends that the burns Travis sustained on March 5 caused acute pancreatitis, which in turn led to respiratory failure and death. I have concluded already that Lowe's testimony is admissible under Fed.R.Evid. 702. The cause of Travis Michaels's death remains a disputed issue of material fact; therefore, summary judgment is inappropriate with respect to plaintiff's wrongful death claim.

### ORDER

IT IS ORDERED that motion for summary judgment filed by defendants Mr. Heater, Inc., Admiral Indemnity Co. and Westchester Fire Insurance Company is DENIED.